E. F. BROWN v. THE STATE.

No. 2200.    Decided June 27, 1913.

Rehearing granted December 17, 1913.

**1.—Fraudulent Banking—Deposit—Indictment—Private Bank.**

Where the indictment alleged that the bank was an unincorporated private bank; that defendant was the owner thereof; that the same was insolvent and that defendant was insolvent, the contention that the indictment failed to allege the names of the persons composing the bank is untenable, and the indictment, under article 532, Penal Code, is sufficient.

**2.—Same—Evidence—Knowledge of Defendant.**

Upon trial of permitting a deposit to be made after the bank was insolvent, there was no error in admitting testimony that such deposit was made as alleged in the indictment, and this although defendant was not present; the evidence showing that defendant established the bank and was the sole owner thereof.

**3.—Same—Refreshing Memory—Insolvency—Books.**

Where, upon trial of fraudulent banking, a witness had testified that he was the cashier of the bank and correctly kept the books thereof, it was legitimate for the State to show by said witness, refreshing his memory from books so kept by him, the amount, character and value of the resources of said bank, and the debts and liabilities of said bank on the date it closed its doors.

**4.—Same—Evidence—State    Banking    Commissioner—Insolvency—Other Transactions.**

Upon trial of receiving deposits in a private bank after its insolvency, there was no error in admitting the testimony of the State banking commissioner to show that the defendant owned a State bank which was also insolvent at the time of the failure of defendant's private bank, and to permit said official to

Vol. 71 Crim.-23.

make such statements from the books of the bank and the data therein; besides, he testified that the same was correct.

### 5.—Same—Evidence—Banking Commissioner.

It was also permissible to show by the State banking commissioner what property of the defendant he received and the investigations he made as to its condition and value, to show whether or not defendant was insolvent; besides, the bill of exceptions was defective.

### 6.—Same—Evidence—Other Transactions.

Upon trial of fraudulent banking, it was permissible to show the property and assets of another bank owned by the defendant and that no capital was paid in at the time of its organization to show the insolvency of the bank in which deposits were received after insolvency, and in this connection the productive capacity of the different plants could be shown, in order to ascertain the real value, etc.

### 7.—Same—Market Value—Intrinsic Value.

Upon trial of fraudulent banking, where the value of the property involved was concerned, the instrinsic value of the property could be shown where there was no market value.

### 8.—Same—Charge of Court.

Upon trial of fraudulent banking, where the evidence sustained the conviction, there was no error in refusing a peremptory charge to acquit.

### 9.—Same—Knowledge of Defendant—Insolvency—Deposits.

Where defendant opened a private bank, the business of which was to receive deposits, he will be held in law to have given his assent to the reception of each and every deposit made in the bank, and there was no error in refusing a special charge to acquit the defendant if he was not personally present when the alleged deposit was made.

### 10.—Same—Charge of Court—Time of Deposit.

Where, upon trial of receiving deposits in a private bank after the same was insolvent, the court submitted a proper charge on the facts in evidence, there was no error, and the contention that there was error in the charge in stating that if the bank received the money after defendant knew the bank was insolvent, etc., as not fixing the time properly, is hypercritical.

### 11.—Same—Charge of Court—Insolvency—Prima Facie Evidence.

Under article 532, Penal Code, the failure of a private bank is prima facie evidence of knowledge of the owner that the same was insolvent or in failing circumstances when the money was received on deposit, and there was no error in the court's charge to so instruct the jury.

### 12.—Same—Charge of Court—Insolvency.

Where, upon trial of illegally receiving deposits in a private bank after the same was in failing circumstances, the court properly defined insolvency, failing circumstances, etc., and did not charge upon the weight of the evidence and there were no requested charges, there was no error.

### 13.—Same—Knowledge—Deposit.

Upon trial of receiving deposits after insolvency in a private bank, there was no error in the court's failure to instruct the jury that defendant must have had knowledge of this individual deposit and given his personal assent thereto before the jury could convict him; as defendant will be held to have assented thereto from the fact that he opened the bank and was the owner thereof.

### 14.—Same—Venue—Presumption.

Where the question of venue was not made an issue during the trial and reserved by proper bill of exceptions, this court under article 938, will presume that the venue of the offense is proved as alleged.

**15.—Same—Evidence—Bills of Exception.**

In the absence of bills of exception to the admissibility of evidence, the same can not be considered on appeal.

**16.—Same—Continuance—Reversible Error.**

Where, upon trial of receiving unlawful deposits in a private bank after its insolvency, defendant's application for a continuance showed due diligence and that the testimony of the absent witnesses was material in showing the solvency of the bank, it was reversible error to overrule same and a new trial should have been granted.

Appeal from the District Court of Bastrop. Tried below before the Hon. Ed R. Sinks.

Appeal from a conviction of receiving a deposit in a private bank after the same was known to be insolvent; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Orgain & Mayfield, Paul D. Page, W. G. Love, W. F. Ramsey,* and *C. L. Black,* for appellant.—On question of overruling motion for continuance: Roberts v. State, 150 S. W. Rep., 627; Keys v. State, 60 Texas Crim. Rep., 279; Presley v. State, 60 id., 102; Rushing v. State, 62 Texas Crim. Rep., 309; Roquemore v. State, 54 id., 592; Marsden v. State, 54 id., 70; Leonard v. State, 53 id., 187.

On question of diligence on first application for continuance: Smith v. State, 54 Texas Crim. Rep., 617; Jones v. State, 55 id., 123; Weaver v. State, 52 id., 11; Johnson v. State, 55 id., 134; Beard v. State, 55 id., 154; Pearson v. State, 56 id., 607; Foster v. State, 52 id., 137; Hardin v. State, 52 id., 238; Collins v. State, 52 id., 455; Wingo v. State, 53 id., 16.

On question of admitting testimony of State Banking Commissioner: Wyers v. State, 13 Texas Crim. App., 57; Jacobs v. State, 42 Texas Crim. Rep., 353; Davis v. State, 61 Texas Crim. Rep., 611, 136 S. W. Rep., 45; Campbell v. State, 138 S. W. Rep., 607; Johnson v. State, 57 Texas Crim. Rep., 488; Shoemaker v. State, 58 id., 518; Howard v. State, 35 id., 136.

On question of written accounts and books: Brown v. State, 150 S. W. Rep., 436; Huff v. State, 23 Texas Crim. App., 291.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—Appellant was prosecuted, convicted and sentenced to two years in the penitentiary under the following indictment, omitting the formal parts:

"That in said County of Bastrop, and State of Texas, on or about the 3rd day of February, A. D. 1912, and before the presentment of this indictment, E. F. Brown did then and there unlawfully assent to the reception of a deposit of money in the sum of $50, current money of the United States, of the value of $50, from and by A. DeGlandon, Sr., which said amount of money was placed to the open deposit account of

and subject to the check of A. DeGlandon, Sr., in and upon the books of The McDade Exchange Bank,—into The McDade Exchange Bank, unincorporated, of McDade, Bastrop County, Texas, the said The Mc-Dade Bank then and there being and was a private bank; the said E. F. Brown then and there being the owner of said The McDade Exchange Bank, and the said The McDade Exchange Bank and the said owner of said bank then and there being and were insolvent and in failing circumstances; and the said E. F. Brown at the time of the reception of said deposit as aforesaid, then and there knew and had knowledge that said bank and the said owner of said bank were insolvent and in failing circumstances. Against the peace and dignity of the State."

Appellant filed a motion to quash the indictment on several grounds, the first being that while the indictment alleged that the bank was a private bank, yet it failed to allege the names of the persons composing the bank. A reference to the indictment will disclose that the indictment not only alleged that it was an unincorporated private bank, but also alleged that appellant was the owner of the bank, and the indictment also alleges not only that the bank was insolvent, but also alleges the insolvency of appellant, the owner of the bank. We have carefully read and considered each ground in the motion to quash, and are of the opinion none of them are well taken. We think the indictment sufficiently and plainly alleges in accordance with the provisions of article 532 of the Penal Code, the offense denounced by this statute against a private bank or banker.

H. W. Freeman testified: "I was cashier of The McDade Exchange Bank on February 3, 1912. I do not recollect receiving a deposit from A. DeGlandon, Sr. (Being shown the deposit slip offered in evidence showing a deposit of $50 by A. DeGlandon, Sr., on February 3, 1912, the witness said) Yes, sir, I wrote this. That is my signature. From the evidence I would say that I did receive a deposit of $50 on that day, the evidence shows it. I suppose I entered that on the books on the individual ledger of The McDade Exchange Bank to the credit of A. DeGlandon, Sr. (being shown entry on the books of The McDade Exchange Bank, the witness said) I think this is the individual ledger of The McDade Exchange Bank. Q. Now, I will ask you, were those books kept correctly? A. I could not say, I kept them, yes, sir; I did not enter a credit to A. DeGlandon, Sr., for $50 February 3, 1912, on the individual ledger of said bank. I did not do that; that entry is in the handwriting of N. K. Freeman, that indicates that he deposited $50 but I did not make the entry. I kept the books generally but these entries were made at Houston at Mr. Christian's office after the bank closed. N. K. Freeman made that entry, I had nothing to do with keeping the books at that time. The books were in Houston when that entry was made; on the 3rd day of February the books were at the bank but we were behind with our business in posting up when the bank was closed and the papers were sent down to Mr. Christian's office at his request and he had Mr. Freeman to make the entry. The way I know

that Mr. Freeman made that entry is that is his handwriting, I can tell his figures and he said he made it. That is the way I know it. I wrote the name of A. DeGlandon, Sr., in that individual ledger there, but I did not put those figures there (indicating). I put the figures January 30th-31st-12. I put them there but did not put February 3, 1912. This deposit was received as an open deposit subject to check. It was not placed on the books because we were behind with our posting. That deposit was not entered in any other book. These deposits were not entered anywhere except in the individual ledger. I kept a duplicate of the deposit slip. (Being shown the books the witness said): Yes, sir; that is the book of The McDade Exchange Bank. It was in my custody until it was turned over to Mr. Christian. My understanding is that Mr. Christian is trustee in the Brown estate. That bank was an unincorporated bank, I suppose you would call it a private bank, I don't know. It was an unincorporated bank. Q. Mr. Freeman, who was the owner of that bank? A. Mr. Brown was, I suppose. As to who employed me, Mr. N. K. Freeman secured me the employment. Q. In whose employ were you? A. I suppose Mr. Brown. Q. Didn't you know you were in Mr. Brown's employ? A. I never saw Mr. Brown for three years. Q. What did he say after you saw him? Did he hold himself out to you as being the owner? A. That was the supposition that he was the owner. Q. I mean when you saw defendant he held himself out to you as the owner of the bank? A. Yes, sir; he seemed to talk that way. The bank closed its doors on the 6th of February. I did not hear of anybody else owning that bank. I didn't hear of anybody else being interested in that bank besides Mr. Brown—not that I recollect of. I made Mr. Brown reports of the condition of The McDade Exchange Bank occasionally, as to how often I would make these reports, sometimes every day and sometimes not for a month or two weeks. The kind of reports I would make him would be just a copy of the book there. I did not make a report from the individual ledger, but from the other ledger, the other ledger shows the resources and liabilities of the bank. This is called the general ledger. I reported the resources and liabilities shown by the book there. At the time The McDade Exchange Bank closed its doors it owed its depositors about $20,000. As to how much time deposits it owed, I think about $1300; I am not positive about that, I can tell from the books. As to how much money I had on hand, I can tell that from the books. I can tell from the general ledger. That is the general ledger of The McDade Exchange Bank which shows the liabilities and resources of the bank. The entries in this book on the 2d, 3d and 5th were made by N. K. Freeman. The last date that I made an entry in that book was January 30th and 31st, and it shows that I had on hand January 30th and 31st, $1158.53 in the vault and due from other banks, $9625.10. On January 27th and 29th there was $1383.43 in the vault and $10,101.88 due from other banks. I do not know what the capital stock of that bank was. Before that book (the general ledger) was sent to Houston to

Mr. Christian it was there in the bank building at McDade in my custody. Q. Was the book properly kept up to the time that you sent it to Houston? A. Yes, as correct as I could keep it."

A. DeGlandon, Sr., testified to making a deposit of $50 at the time stated by Mr. Freeman. This testimony was objected to on the ground that the transaction took place in the absence of the defendant, and would not be binding on him. The record discloses that appellant established The McDade Exchange Bank, and that he was the sole owner of the bank. When he opened this bank he did so for the purpose of doing a banking business, the element of a banking business being the reception of deposits from its patrons and the public generally, and when he established this business, placed men in charge of it, had reports mailed to him, it would be immaterial whether or not he ever visited the bank again; he in law would be held to have given his assent to all steps necessary and proper in the conducting of a banking business at McDade, and as this bank was opened by him and a part of its business at least was to solicit and receive deposits, he would be held to have given his assent to each and every deposit received by the bank, including the deposit received from Mr. DeGlandon, Sr. The receiving of deposits is a necessary incident to a legitimate banking business, and when appellant established the bank and opened it for business, placing his agents and employes in charge, to do a banking business, he will in law be held to have given his assent to each and every act within the scope of business authorized by him to be done by his agents and employes. When Cashier Freeman had testified he kept the books of the bank and they were correctly kept, it was legitimate for the State to show by the witness, refreshing his memory from the books so kept by him, the amount, character and value of the resources of The McDade Exchange Bank, and the debts and liabilities of the bank on the date it closed its doors.

Several objections were urged to the testimony of State Banking Commissioner Gill. Appellant owned the Paige State Bank as well as The McDade Exchange Bank, and as it was necessary to show the insolvency of appellant at the time of the failure of The McDade Exchange Bank as well as the insolvency of the bank, it was perfectly legitimate to show whether or not the Paige State Bank was at that time insolvent, and the value of all properties owned by appellant, his debts and liabilities, and any testimony bearing on those issues was admissible in evidence. The State asked Commissioner Gill the following question: "Now, Mr. Gill, what was the condition of the Paige State Bank the day it closed and what is its condition now?" To which question the witness answered: "I can answer that question by producing a statement of the condition of the bank the day I took charge of it, if that would be satisfactory." Appellant objected to the statement being introduced in evidence, and Mr. Gill's testimony in regard thereto. It is true that Mr. Gill testified that the statement was made from the books of the bank and the data in the bank by one of his employes, but he also states

that after it was made he checked it and verified it and knew it to be correct, and under such circumstances the court did not err in admitting the testimony. Again Mr. Gill testified that prior to the closing of the doors of the Paige State Bank he had the bank examined; that certain notes were held by that bank which he demanded be removed from the bank, the money or other valid and valuable securities be substituted therefor. That "he had written several letters to the defendant, Brown, addressed him as president of the First State Bank of Paige, and also in a personal conference with him on the 18th of January, in which the witness demanded that the paper be removed from the bank within thirty days, and that defendant agreed to comply, and in about sixteen days he wired the witness that he had removed the paper from the bank and that the defendant had taken out about $17,000 worth of the paper which he had demanded him to remove on January 12, 1912, by putting in $19,000 worth of other paper, the $19,000 worth of paper put in in lieu of that taken out being shown in the list testified to by the witness as a list of the liabilities of the defendant to the Paige State Bank at the time it was closed.

"Witness further testified that after said bank was closed he placed some of said notes with Ewing Boyd for collection. That said notes were not due until practically a year after and the makers did not dispute their liabilities that he knew of. And in that connection the State offered in evidence the following letter after having identified the same as bearing the signature of the defendant and as having been written by him, which letter reads as follows:

E. F. Brown, President.      N. P. DeLatte, Secretary.
S. J. Spencer, Vice Pres. & Gen. Mgr.
W. D. Elliott, Treas. & Asst. Mgr.

Capital Stock, $175,000.

### THE BROWN BRICK & TILE CO.
Manufacturers of
Building Brick, Paving Brick, Fire Proofing and Drain Tile.
Main Office: 228-229 First National Bank Bldg.
Plant and Branch Office: Garrison, Texas.

Houston, Texas, Feb. 1st, 1912.

Mr R. L. Bledsoe, Cashier, Paige, Texas.

Dear Bledsoe: Through the kindness of Mr. Endt, I hand you herewith note of W. P. Bingham, $2500; J. C. Payne, $2500; M. K. King, $2500; C. M. Norton, Jr., $2000; R. W. King, $2500; W. F. Daniel, $2000; Patillo Higgins, $2500, and J. B. LeBleu, $2500, which totals $19,000. I have endorsed all these notes over to the Paige bank, and I consider the notes absolutely good, as each one of them is secured, in my opinion, amply sufficient even without any other resources to pay the note.

Therefore, credit my account with $19,000, and after doing this,

endorse over to me without recourse on the Paige bank, the following notes: W. D. Elliott, $1500; W. D. Elliott, $700; N. P. DeLatte, $1700; N. P. DeLatte, any other notes; Standard Auto Company, $800; C. J. N. Hansen, $600; Texas Furniture and Trading Company, $1200 (I hold); A. F. Sundemeyer, $750; F. G. Lindsey, $1000; A. H. and J. W. Eroe, $2500; H. W. Freeman, $1000; J. D. Staples, $500; S. A. Kincaide, $75, and charge their total together with all interest to my account. You should also make me some allowance on some of the paper that you endorse to me where the interest had been paid in advance, and when you have completed these entries, advise me through the kindness of Mr. Endt, what my balance with you amounts to.

You may forward this paper that you endorse over to me by and through Endt.

Yours very truly,

E. F. Brown, President.

The State followed this testimony by offering testimony as to the notes of M. K. King, R. W. King, Patillo Higgins, C. M. Norton, Jr., and others, showing that the makers of the notes were in such financial condition at the time they executed the notes that they could not have been compelled to pay the notes; that they in fact owned no property subject to execution. As illustrative of the testimony, M. K. King testified: "I live in Houston. Some time in January, possibly the first of February, I bought some stock in the Brown Brick & Tile Company from Mr. Brown and gave my note for it. The note was for $2500. My wife also bought $2500 worth of stock in the same company and paid for it by giving her note for $2500. We have never paid these notes. I don't know exactly what I was worth above my exemptions at the time these notes were given, but they could not have been made out of me. I did not have property out of which they could have made it; I have lived in Houston all of my life and know Mr. Brown only a few months. I can't say how long I have known him in Houston. I purchased this stock from him on the second floor of the First National Bank Building in his office. I bought first $2500 worth of the stock and my wife suggested she would take some of it, and then I went back with my wife and she bought some stock and gave her plain note for it. She is not worth any more than I am. These notes were to be attached to the stock as collateral. I don't know what Mr. Brown did with them. If my memory serves me right he told me he was going to put them in the bank. I don't know that he put them in the Paige State Bank, but he told me he was going to put them in the bank."

It is thus seen that when the State Banking Commissioner in his examination of the bank found therein worthless paper, and demanded that it be taken out, appellant substituted therefor other paper, which had no real commercial value, as the makers of the notes state that they had no property subject to execution. As illustrative of the method pursued in selling stock of his various enterprises, the following agreement given to D. F. Rowe is copied herein:

"Agreement.  In' consideration of D. F. Rowe of Houston, Harris County, Texas, in a manner satisfactory to us, of the capital stock of the McDade Brick Company of McDade, Bastrop County, Texas, with a par value of $500, we, E. F. Brown as president, and for The McDade Exchange Bank, unincorporated, of McDade, Bastrop County, Texas, and N. K. Freeman, hereby guarantee and warrant that said stock will pay an aggregate annual dividend of at least 8 per cent on the par value of said stock for the first year, and at least 10 per cent for the second year, as above outlined; and in the event that said stock does not earn 8 per cent per the first year, and 10 per cent the second year, then, and in that event, we agree, at the option of the holder, to either pay the difference between the 8 per cent or 10 per cent, as the case may be, or to pay par value for the stock, plus enough, together with what the stock has earned, to make an earning of 8 per cent for the first year and 10 per cent for the second year.  And in case said stock shall earn at least 8 per cent for the first year, and at least 10 per cent for the second year, then and in that event, this contract or agreement becomes null and void, and there is no further liability upon the part of the makers thereof.

"Witness our hands this 23rd day of September, A. D. 1909.  E. F. Brown, President McDade Exchange Bank, unincorporated, of McDade, Texas, N. K. Freeman."

"The defendant wrote me a letter dated April 28, 1911, with reference to the matter, it reads as follows:

"Houston, Texas, Apr. 28, 1911.  Mr. D. F. Rowe, Houston, Texas. Dear Sir:  I wish these few lines to serve that the McDade Brick Company is a going concern and has been for about a year or such a matter, and is also incorporated.  From my conversation with Mr. N. K. Freeman of McDade, Texas, I am advised that the company had earned about 12 to 14 per cent the first year.  I hand you herewith check for $40, being a dividend of 8 per cent on your $500 investment, which we trust is satisfactory.  We further expect to issue you your stock in the next few days, which we will ask that you endorse same and attach to your note as collateral.  I personally believe that as an investment that the stock of the McDade Brick Company should be profitable and I know of no reason why 15 to 20 per cent should not reasonably be relied upon.

Yours truly,
(Signed)    McDade Brick Company,
By E. F. Brown, President."

"I received the check mentioned in the letter and put my name on it and it was endorsed as a credit on my note."

Of course, these facts do not appear in the sale of all the stock shown to be sold, but there is no evidence in the record of a sale of stock in any of the various enterprises of appellant which in all respects show a good faith transaction.  In addition to this, the evidence would indi-

cate that no dividends had been earned by the McDade Brick Company, and in paying the above dividend to be credited on the note for the purchase of the stock, it was but a payment made that other stock might be sold. All these transactions took place prior to the failure of The McDade Exchange Bank, and as appellant was the sole owner of that bank, the evidence was admissible as having a strong tendency to show that appellant was insolvent at that time, and if so, of necessity, the bank would also be insolvent, and he was aware of that fact, and in permitting the bank to remain open subsequent to these transactions for the reception of deposits, if insolvent, he would be guilty of violating the law. It was not hearsay, because it showed direct dealings with the appellant by the Commissioner, and it was material to the issues in the case, having a tendency to show whether or not appellant was insolvent, and was aware of that fact. As the assets claimed by appellant was sixty-five shares of stock in the Paige State Bank, it was permissible for the Commissioner of Banking to state that it had no value. The evidence shows he was aware of the assets and liabilities of that bank, and was in position to know the value of the stock. L. C. Christian was appointed trustee in bankruptcy of the estate of appellant within a few days after the reception of the deposit of Mr. DeGlandon and the failure of The McDade Exchange Bank. It became his duty to reduce to possession all the property of appellant, and it was permissible for him to testify and for the State to prove that he was in possession of all the property of The McDade Exchange Bank as the property of appellant, and that no person other than appellant, within his knowledge, had ever asserted or claimed any interest in that bank. The deposit was received by The McDade Exchange Bank on February 3rd, and it is shown that he was authorized by the bankrupt court to take charge of all the property of appellant on February 7th, only four days after the deposit, and which was after appellant had filed a petition of bankruptcy. It was also permissible to show by this witness the property he received, the investigations he had made as to its value and condition of the property. The condition of the property would be material in arriving at its value, and the value of it was a material issue in determining whether or not appellant was insolvent. In the bill none of the testimony given by this witness is stated, and it is so general in its terms as to bring no specific question or answer in review. None could contend that all of Mr. Christian's testimony was inadmissible, and if any part of it is subject to any objection urged, that portion should have been stated in the bill, and specific objection leveled at that portion of the testimony. In the case of Ortiz v. State, recently decided, the opinion being written by Presiding Judge Davidson, the rule is stated with clearness, and a large number of authorities cited, and it is made plain that the portion of the testimony objected to must be stated, and the objection point out specifically the part objected to, and the objections made. See also Branch's Crim. Law, sec. 47, and cases there cited.

It was also permissible for the witness Broesche to testify in regard to

the property and assets of the Ellinger Banking Company. Mr. Broesche was cashier of this bank, which was shown to be a private bank instituted and controlled by Mr. Brown, and that no capital was paid in at the time of its organization. This testimony all had a bearing on the value of the property and assets of this bank, and the knowledge of defendant of its value. The material issues in this case were, was Mr. Brown and The McDade Exchange Bank insolvent at the time of the reception of the deposit, and was Mr. Brown aware of that fact at the time the deposit was received, and any and all evidence which would have a direct bearing on those issues would be material and admissible. It was necessary for the State to prove the property appellant owned at the time of the reception of the deposit, its condition, and value, and the amount of his indebtedness and liability to enable the jury to determine whether or not he in fact was insolvent, and it was permissible for the State to prove by Messrs. Elliott and Spencer the value of the Brown Brick and Tile Company at Garrison and its stock on February 3rd, and by Messrs. LeMaster and Harvey the value of the McDade Brick Company on that date. Mr. Brown owned a number of shares of stock in each of these concerns, and the value of the stock and property owned by him in each was material on the issue of his solvency or insolvency. Each of these witnesses show a thorough knowledge of the property, its productive capacity, etc., and possessed of information which enabled them to fix its value. If, as a fact, there was no market for the property, then the property could be described, its cost, etc., stated, and its value thus fixed. As to stock in corporations, the productive capacity of the plants could be stated, what its stock, if they had heard, was selling for, and any fact or circumstance stated which would enable the jury to correctly determine the real value. Mr. Wharton, in his work on Criminal Evidence, says: "Where value is in issue, hearsay is primary, and indeed the best evidence, and in proving value it is always admissible to resort to hearsay. The inquiry in such cases should be confined to the market value at the time, or what the article would bring at a well conducted sale. If there is no market value, the opinions of those qualified to judge are competent to show intrinsic value." Sec. 258 and cases. This rule has always been followed by this court and our civil courts. We have carefully reviewed each and every exception to the testimony, and none of them present error.

Special charges Nos. 1, 2 and 6, requested by appellant, were given, while special charge No. 3 was a request for an instructed verdict of not guilty. The court did not err in refusing this instruction. No. 4 was a request that if defendant was not personally present when the deposit was made to acquit. As hereinbefore stated, this is not the law. When appellant opened the bank, a part of its business being the reception of deposits, appellant will be held in law to have given his assent to the reception of each and every deposit made in the bank. Special charge No. 5 was fully covered by the court in his main charge, he instructing the jury:

"You are instructed that by the term 'insolvency,' as applied to this case, is meant that E. F. Brown did not have sufficient assets to pay his debts.

"By the term 'failing circumstances' is meant, as applied to this case, that E. F. Brown did not have sufficient assets to pay his debts.

"By the term 'assets,' is meant the property, real and personal, belonging to said E. F. Brown, his bills receivable, notes, obligations due E. F. Brown, of any and every character, considering the solvency of the makers, endorsers and guarantors thereof, and the value of the securities thereon, if any, also including all stocks held by him as his property.

"If you believe from the evidence, beyond a reasonable doubt, that on or about the 3rd day of February, A. D. 1912, in the County of Bastrop and State of Texas, that the said A. DeGlandon, Sr., did deposit the sum of $50, current money of the United States, into The McDade Exchange Bank, unincorporated, and that it was received by said bank as a deposit, and that the said The McDade Exchange Bank was then and there situated in Bastrop County, Texas, and was a private bank, and that the said E. F. Brown was then and there the owner of the said The McDade Exchange Bank and that the said bank and the said E. F. Brown were, at the time of the reception of said deposit, if any, insolvent and in failing circumstances, and that the said defendant, E. F. Brown, at the time of the reception of said deposit, if any, then and there knew that he, the defendant, and the said bank were insolvent and in failing circumstances, then you will find the defendant guilty, as charged in the indictment, and assess his punishment at confinement in the penitentiary for a term of not less than two nor more than ten years.

"If you do not so believe from the evidence, beyond a reasonable doubt, you will acquit the defendant.

"If you do not find from the evidence, beyond a reasonable doubt, that the defendant, E. F. Brown, was the owner of said bank at the time of the reception of said deposit, if any; or if you do not find from the evidence, beyond a reasonable doubt, that he assented to the reception of said deposit, if any, in said bank; or, if you do not find from the evidence, beyond a reasonable doubt, that at the time of the reception of said deposit in said bank, if any, that he, the defendant, and said bank were insolvent and in failing circumstances; or, if you do not find from the evidence, beyond a reasonable doubt, that at the time of the reception of said deposit, if any, the defendant knew that he was insolvent, if he were insolvent,—then, in either case, you are instructed to return a verdict of 'not guilty.'"

Special charge No. 7 should not have been given, as there is positive testimony that DeGlandon deposited $50 in money in the bank, therefore the charge requested has no foundation in the evidence. Special charge No. 6, given at request of appellant, was as favorable, if not more favorable to appellant than the law required. It reads: "You are

instructed that a person engaged in a banking business is not required
to hold, preserve or return the identical money deposited in such bank
by a customer or depositor, but he is entitled to use such deposit in the
conduct of the business of such bank, and in making the loans and dis-
counts, and the fact that the defendant did not return to the witness
DeGlandon the deposit alleged in the indictment, will not be considered
by you as evidence of the defendant's guilt, unless the other elements
necessary to establish his guilt have been shown by the evidence to your
satisfaction, beyond a reasonable doubt." The "other elements of the
offense" necessary to be proven were fully stated by the court in his
main charge. These are all the special charges requested, but in the
motion for a new trial there are some complaints of the charge as given,
and for this reason we have copied hereinbefore those paragraphs of
which complaint is made, except as to the one defining the offense. As
to that paragraph, it is claimed that error was committed in stating that
if the bank received the money "after" appellant knew the bank was
insolvent, etc., the contention being that this did not fix the time prop-
erly. In applying the law, as hereinbefore shown in that part of the
charge copied, the court instructed the jury that appellant and the bank
must have been insolvent at the time of the reception of the deposit,
and appellant must have known that fact, and the criticism of the word
"after" in the definition of the offense is hypercritical.

Article 532 of the Penal Code provides that the failure of a private
bank shall be prima facie evidence of knowledge of the owner or owners
that the same was insolvent or in failing circumstances when the money
was received on deposit, and the court did not err in so instructing
the jury.

Those portions of the charge defining insolvency, failing circum-
stances and assets are not subject to the criticisms contained in the
motion for new trial. They are not upon the weight to be given the
testimony, and are but definitions of the legal meaning of these words.
In applying the law every question of fact was left for the determination
of the jury. The definitions as given are correct, and if appellant de-
sired a more full and ample definition of these terms he should have
requested that same be given before the return of the verdict. There
is no error in those paragraphs, and no jury could have been misled by
the terms as used.

The complaint of the charge as given that it failed to instruct the
jury that he must have had knowledge of this individual deposit, and
he must have given his personal assent to the reception of this particular
deposit, is not well taken. As before stated, when he opened the doors
of this bank for the reception of deposits, he will be held to have
assented to the reception of every deposit received, until the con-
trary is made to appear from the testimony, that is, he has given dif-
ferent and other instructions.

Article 938 provides that this court shall presume that venue was
proven in the court below, and since the adoption of this statute it has

always been held that unless the question of venue was made an issue in the trial of the case, and the question presented by a bill of exceptions, we must and will presume that the venue of the offense was proved as alleged.

Those grounds in the motion complaining of the admissibility of certain testimony to which no bills of exception were reserved can not be considered by this court, and the only other bill of exceptions complains of the action of the court in overruling his motion for a continuance. This ground in the motion is one to which we have given much thought and study. The bill presenting this question is rather meager, but as the motion is copied in the record in another place we suppose it would be our duty to consider every allegation therein contained, and pass on them in the light of the testimony adduced on this trial. It shows appellant was arrested on June 29th, and that on July 6th he mailed commissions to take the testimony of a witness alleged to live in Pittsburg, Pa., and a witness alleged to live in St. Louis, Mo. He states in his application that both were absent from home at the time the depositions were received in St. Louis and Pittsburg, towit: July 8th and July 9th. The case was called for trial on July 11th, and his application overruled. He states that he expects to prove the value of the Brown Brick and Tile Company. This was an issue in the case, as its value would be considered in passing on the solvency or insolvency of appellant at the time the deposit was received by The McDade Exchange Bank. These witnesses are not shown to have been very familiar with the property of the Brown Brick and Tile Co.; merely to have inspected same on two or three occasions, and if they had testified as alleged, we do not think in view of the other testimony that it would have changed the result. For them to have stated the value of this stock, as it is alleged they would, in the light of the other testimony, would not have authorized any jury to find that he was solvent on the day the deposit was received in The McDade Exchange Bank. Again, we are not prepared to hold that appellant used that diligence required by the law. He waited until only five days before his case was set for trial to send off the depositions, and it is shown that one of them at least was at that time residing in another State than the one to which the depositions were sent. As to the other witnesses named, the diligence used to secure their attendance is perhaps sufficient, but is the testimony of that character, under the testimony adduced on this trial, that should cause a new trial to be granted. The learned trial judge who overruled the application, after verdict, had the matter again presented to him, and he, who heard the testimony, was of the opinion that it was not of that character. Under subdivision 6 of article 608 there is a discretion allowed him on passing on applications, with the instructions that on a motion for a new trial if it appears that the testimony was of a material character and probably true, he should grant a new trial. In the light of the testimony of the witnesses living near and adjoining the McDade Brick Company, the man who sold the company

the land, the trial court must have found and believed that the witness would not testify as alleged if he had been present, and under the evidence as heard on the trial, the testimony of the others named would not be very material. The discretion confided in the trial judge we have no right to review unless it should appear that he has abused his discretion, acted arbitrarily in the matter, or we, after reading the record, should be of the opinion that it was of that material nature it would probably have resulted in a different verdict. Under the testimony before us, if the witnesses had all testified as alleged, in our judgment no other or different verdict would have been rendered. We appreciate the fact that it is not our view of the facts, but a defendant has the right to have a jury pass on the evidence, and we are always loath to affirm a case when the record discloses he has been deprived of any testimony which he has used diligence to secure, and we have read the statement of facts more than once with the sole idea of determining that if appellant had introduced the testimony he claims these witnesses would have sworn to, in the light of all the testimony, it was even probable that a verdict more favorable to him might have been secured. Not being able to arrive at that conclusion, we have decided not to disturb the finding of the trial judge in this matter.

The judgment is affirmed.

*Affirmed.*

DAVIDSON, PRESIDING JUDGE, dissents.

ON REHEARING.

December 17, 1913.

HARPER, JUDGE.—Appellant has a very lengthy motion for a rehearing, and a very able and extensive brief; and we have given both of them painstaking consideration. While every ground in the motion for a new trial is again brought forward, and it is insisted that each presents error, yet, the main insistence seems to be placed on two grounds,—the first of which is that the court erred in overruling the application for a continuance, being the most serious question; the second, that the charge is erroneous in that it did not require the jury to find that Mr. Brown gave personal assent to the reception of this deposit is, in our opinion, without merit. The proof unquestionably shows, in fact, there is no denial of the fact, that appellant went to McDade, opened a private bank and held himself out as doing a general banking business. A banker solicits and expects deposits, and when he opened the doors of this bank (being the sole proprietor), and put officers in charge, he will be held in law to have given his assent to each and every deposit received, so long as he holds himself out as doing this character of business. If in the evidence there was any question raised that he had instructed those in charge not to receive deposits, or this deposit, or that it was not the legitimate business of a banker, or this bank, there might be some merit in this contention. But the fact that after opening the bank, he placed others in charge to do

the business, and he went to Houston, would not raise the issue that he did not assent to the deposit, when he knew this would be a legitimate and necessary part of the business he had opened in McDade.

As to the motion for a continuance, we have again studied it, in connection with the entire record, and in our action on this ground of the motion for a new trial, we may have erred in the original opinion. One of the main questions to be passed on by the jury was, was appellant solvent or insolvent at the time the deposit was received? Appellant contends that if the testimony of these absent witnesses were believed by the jury, their testimony would show that his assets were worth $97,315, while his liabilities were much less than this amount. From the former reading of the record, we did not arrive at that conclusion, and hardly think it would justify such a conclusion even now. However, if the testimony of these witnesses would show him solvent at the time the deposit was received, then, of course, he would not be guilty of the offense charged in the indictment. That the diligence used as to the witnesses N. K. Freeman, W. E. Gray and P. O. Endt was sufficient must be conceded. By Freeman he stated he expects to prove that the McDade Brick plant was of the approximate value of $18,000. Other witnesses place it at hardly so many hundreds; consequently, if the witness would so testify he is entitled to have the jury pass on the matter. By the witness Gray he expected to prove the value of the assets of the bank at Elkhart, and of which appellant was the owner, and he would value these assets at $13,000. The value of the assets of this bank was not seriously questioned on this trial. By P. O. Endt, he states, he expects to show facts that will tend to prove the value of the stock of the Brown Brick and Tile Company, and this would go materially to show whether or not he was solvent. He also wanted the testimony of the two witnesses whose depositions he sought as to the value of the stock of the Brown Brick and Tile Company. To our mind the testimony would show that this tile company was overcapitalized, and the stock worth much less than par, but if these three witnesses would testify as stated in the motion, their testimony would have a tendency to show that it was really of par value, and if so, it would have considerable bearing on whether or not appellant was solvent. Taking into consideration the efforts the record discloses appellant used to get these witnesses, and, while viewing the matter as we do from a careful perusal of the record, it is extremely doubtful to us if they had been present and testified as it is claimed they would, it would have resulted in a different verdict; yet, the question is, have we the right thus to weigh the testimony? Or was this the province of the jury? He made efforts to get this testimony; it was through no fault of his that three of them were not in attendance, and he used reasonably fair diligence to obtain the depositions of the other two. Under the circumstances we may have been in error in holding that there was no error in overruling this application for a continuance, it being the first application.

Rehearing granted and the case is now reversed and remanded.

*Reversed and remanded.*

DAVIDSON, JUDGE.—I concur in reversing this conviction upon the ground stated by Judge Harper. I want to add that the correct rules are laid down in Roby v. State, 41 Texas Crim. Rep., 152, and Fleming v. State, 62 Texas Crim. Rep., 653, upon which this case should be tried, and I deem it not necessary to review the questions involved further than to cite the above cases.