## SMITH *v.* STATE OF INDIANA.
[No. 25,922.   Filed June 23, 1932.]

*S. C. Kivett, J. L. Kivett* and *Robert G. Miller,* for appellant.

*James M. Ogden,* Attorney-General, and *V. Ed Funk,* Deputy Attorney-General, for the State.

ROLL, C. J.—This is an appeal from a judgment of the Monroe Circuit Court, wherein appellant was adjudged guilty of the crime of embezzlement in receiving

a deposit in the Exchange Bank of Spencer, Indiana, on June 15, 1929, at a time when the bank was alleged to be insolvent. §2479 Burns 1926, Acts 1907 p. 14.

The error relied upon for reversal is the action of the court in overruling appellant's motion for a new trial, wherein it is contended the court erred: (1) In giving instruction No. 8 by the court of his own motion; (2) in refusing to give appellant's tendered instruction No. 9; (3) the verdict of the jury is contrary to law; (4) the verdict of the jury is not sustained by sufficient evidence.

Appellant was president of the Exchange Bank of Spencer, located at Spencer, Indiana, and was charged in the indictment herein with unlawfully, feloniously and fraudulently receiving from John E. Harrison $826.67, as a deposit with said bank, on June 15, 1929, and that said bank was then and there wholly insolvent, which fact was then and there known to said president, and whereby said sum was lost to said depositor. The bank closed at the usual closing hours on Saturday, June 15, 1929, and failed to open for business on Monday, June 17, or thereafter.

There was a change of venue from Owen County to Monroe County where the case was tried before a jury, which returned a verdict of guilty, and judgment was pronounced accordingly.

Appellant in his motion for a new trial challenges the correctness of certain instructions given by the court on its own motion; and also complains of the refusal to give instructions Nos. 20, 21, 22, 23 and 24 tendered and requested by him.

The record does not show appellant tendered any such numbered instructions, but does show he tendered instructions Nos. 1 to 9, inclusive. Instructions Nos. 20, 21, 22, 23 and 24 are not a part of the record and therefore no question as to the cor-

rectness of such instructions is presented to this court. *Foreman* v. *State* (1929), 201 Ind. 224, 167 N. E. 125. Likewise no question is presented to this court in refusal to give tendered instruction No. 9, as appellant did not assign such refusal as a cause in his motion for a new trial. §610 Burns 1926, cl. 8; *Reeves* v. *Plough* (1872), 41 Ind. 204; *Jones* v. *Layman* (1889), 123 Ind. 569, 573, 24 N. E. 363.

Appellant challenges instruction No. 8, given by the court of its own motion, which instruction reads as follows: "One of the questions for you to determine in this case is whether the Exchange Bank of Spencer, Indiana, was solvent or insolvent, on the 15th day of June 1929.

"This is a question of fact to be determined by you as any other fact; from the evidence in the case.

"I instruct you that a bank is solvent when it has enough assets to pay, within a reasonable time, all of its liabilities as they become due in the ordinary course of business; or in shorter terms, when it can pay its depositors on demand in accordance with its promises.

"When the actual cash market value of the assets of the bank is not sufficient to meet its liabilities in the manner and form above stated, such bank is insolvent." It is to the latter part of this instruction that appellant most seriously objects.

Is a bank insolvent when the actual cash market value of its assets is not sufficient to pay its depositors upon demand or in the usual course of business? We do not think that this is necessarily true. A bank may be solvent and yet not be able to pay all of its depositors upon demand or even in the ordinary course of business. If the rule is to be adhered to that a banking concern must keep its financial matters in such a condition that its assets could be turned into or required to be turned into cash at such short notice, it would be a matter of

impossibility for a banking concern to exist as a business institution, or continue with any degree of safety to those connected therewith, and under such a rule its officers might and could at any time be adjudged criminals and made felons when there was no evidence of fraud or criminal intent on their part. Such a requirement of banks is not in accord with good judgment or sound reasoning.

The question, when is a bank insolvent within the meaning of a criminal statute is a question of first impression in this state but has been before the courts of last resort in several other states, and we find that two different rules have been applied in such courts. In the case of *State* v. *Cadwell* (1890), 79 Iowa 432, 44 N. W. 700, which is one of the first cases to decide this question, they adopted what may be designated as the "bankruptcy," or "traders and merchants" rule. In that case the court quotes with approval from *Thompson* v. *Thompson* (1849), 4 Cush. (Mass.) 127, as follows: " 'By the term 'insolvency,' however, as used in these statutes, [meaning insolvency statutes] we do not understand an absolute inability to pay one's debts at some future time, upon a settlement and winding up of all a trader's concerns, but a trader may be said to be in insolvent circumstances when he is not in a condition to pay his debts in the ordinary course, as persons carrying on trade usually do.' "

The court further said: " 'In *Toof* v. *Martin*, 13 Wall. 40, the court, after referring to the more general and popular meaning of the word 'insolvency,' adds: 'But it is also used, in a more restricted sense, to express inability of a party to pay his debts as they become due in the ordinary course of business. It is in the latter sense that the term is used when traders and merchants are said to be 'insolvent'; and, as applied to them, it is the sense intended in the act of congress.' "

Other cases are cited in the Iowa case in support of the above rule, but it will be noted that all of them are civil cases, and the construction given by the different courts applies to the sense in which the word "insolvent" is used in bankruptcy and insolvency statutes, and not to criminal statutes. We think in the construction of the statute here involved, being a criminal statute, we should endeavor to give the meaning thereto intended by the Legislature. One of the cardinal principles employed in statutory constructions is to give to the words employed by the Legislature to express their intent their ordinary, general and usually accepted meaning, unless there is something in the statute that would at least indicate that the words were to be construed differently, and a more limited and restricted meaning was intended. *State* v. *Shelton* (1906), 38 Ind. App. 80, 77 N. E. 1052; *Boyer* v. *State* (1908), 169 Ind. 691, 83 N. E. 350. As we read this statute (§2479 Burns 1926), we find no reason for holding that the Legislature intended the word "insolvent" to be construed in a limited and restricted meaning, and we therefore hold that it should receive its general and most commonly accepted meaning.

We think an officer of a bank should not be held guilty, under our statute, if, at the time the deposit was received, the assets of the bank fully equaled in value the sum of its debts even though it may require some time to realize on those assets. The gist of the matter is that a deposit is received by a banker, knowing or having good reason to believe that the money will be lost to the depositor, by reason of the inability of the bank to return it; but if the assets on a fair valuation are amply sufficient to pay all depositors, including the one in question, and all other debts of the bank, the bank could not be said to be insolvent in the usual sense of the term, nor is there any

good reason for saying, in such a case, that the officer, so receiving deposits in the bank, knew or had good reasons to know that the bank was insolvent. Suppose a banker finds that his bank is low on cash reserve, and in such a condition, by reason of having failed to receive a large, expected deposit of money, is therefore unable to pay the demands made upon his bank in the ordinary course of business, but an inventory of all the assets of the bank appraised at a fair valuation if liquidated in a reasonable time in a reasonably prudent manner in his honest judgment would be equal to or in excess of its liabilities. Could it in justice and common sense be said that the receipt of a deposit by such a banker would under such circumstance be criminal? Yet under the limited and restricted meaning of "insolvency" he would. A banking institution in such condition might be a fit subject for a suit in equity for the appointment of a receiver to insure an equitable distribution of its property, on petition of its creditors, but certainly its officers would not necessarily be criminals. In the case of *Gass* v. *State* (1914), 130 Tenn. 581, 172 S. W. 305, in considering the two theories, the court said: "If the other theory [meaning the restricted and limited application] be held a correct one, and a banker must always feel that he stands within touch of the doors of the penitentiary if he shall accept a deposit, or fail to close the doors of the bank in every case where there is danger of not being able to meet the debts of the bank on demand, his ability to extricate the business from disaster will be to a great degree paralyzed by the apprehension for his personal safety which he will necessarily feel. . . . Every one knows how the assets of a bank shrink and shrivel where it is compelled to stop business. Many debtors who during the running of the bank would pay their debts in order to maintain their standing, even though not wholly solvent, would cease

to try to pay on the cessation of its business. Many others who are able to pay will delay until forced to settlement after transfering their allegiance to some other institution. Such property of the bank as requires to be sold will lose in value because buyers are aware of the necessity of selling, and the inability of the bank to stand out for proper terms. . . . We repeat, safety cannot be secured by terrorizing the officers of banks, with a knowledge that if they should have to close their doors at any time under a sudden stress of circumstances by reason of a change in the financial aspects of the country, or by reason of inability to quickly realize upon assets, they would be subjected to indictment and conviction on a charge of felony. . . . Safety is secured by requiring officers having the control or management of banks to keep closely in touch with the assets, and to have a reasonable knowledge of their value, and to refuse to receive deposits when they find they are not amply sufficient to pay all debts exclusive of capital stock, surplus, and undivided profits of stockholders. If a bank continues to do business when it is not solvent in this sense, and it receives deposits, it is guilty of negligence of so hazardous a character as to amount to positive fraud and criminal liability under the statute."

In the case of *Ellis* v. *State* (1909), 138 Wis. 513, 119 N. W. 1110, 20 L. R. A. (N. S.) 444, 131 Am. St. 1022, the court had occasion to construe a similar statute. Appellant in that case was convicted of receiving deposits into a bank for the credit of a depositor with knowledge, or good reason to know, that the bank was unsafe or insolvent, contrary to §4541 St. 1898 of Wisconsin, which was very much the same as our statute on this subject. The jury was instructed in that case that, whether the bank was insolvent on the particular days material to the case, turned on whether it had sufficient assets to meet its liabilities in the ordinary

course of business, and whether the accused at such time had good reason to know the bank was unsafe or insolvent, was whether he had such reason to know it did not possess sufficient assets to pay all its liabilities as they matured and became payable in the ordinary course of business. The court refused to instruct the jury that the statutory test was whether the fair value of the assets on the particular days was sufficient to cover the liabilities, exclusive of liabilities to stockholders. The court in discussing the merits of the instruction given and the one refused said: "There is no question but that insolvency, as the subject is dealt with under the insolvent and bankrupt laws, regarding a condition where, by the theory of such laws, the person or concern should suspend and take such measures or submit to such, for the protection of creditors, as to insure equality of treatment, is as the court instructed the jury. That is the limited, not the common, popular, or general meaning of the term. The latter suggests, merely, a substantial deficiency of assets to cover liabilities. In a multitude of authorities involving administration of bankrupt and insolvent laws and situations properly classible therewith, authorities mainly relied upon by the prosecution, insolvency is viewed in the limited sense, while the general sense is universally conceded to be as indicated. So it will be seen that a bank may be insolvent in the limited sense and clearly not in the broad general sense.

"Must the limited meaning be given to the term 'unsafe or insolvent,' as used in the statute? Is it true that, under all circumstances, the proprietors of a bank, though believing they have an abundance of assets to pay out within a reasonable time all liabilities to depositors, must close the doors and go into liquidation whenever they have good reasons to know they will, or probably may, not be able to pay all demands upon the

bank in the usual course of business, and that every moment of time they keep open for business thereafter they are criminals before the law and liable to be prosecuted and punished by long terms of confinement in the state prison? If such is the law, the banking business is exceedingly unattractive and the more conscientious the banker is, the less attractive it is. . . .

"The reason for not adopting the drastic meaning attributed to the statute by the trial judge, suggested from the viewpoint of the banker, is reinforced by one quite as persuasive from the point of view of the patrons of the bank. It is a matter of common knowledge that liquidation of a bank in insolvency proceedings is inevitably attended with great loss which commonly falls on the depositors. So when a banker stands face to face with a condition of probable inability, merely to pay all liabilities 'in the ordinary course of business,' he knows that to go into liquidation, unless that is absolutely necessary, is inviting disaster for the depositor often in far greater measure than to persist in going on."

We quote with approval the further excerpt from this same case. "We venture to say that, in all situations except in respect to the administration of bankruptcy and insolvency laws, the term under consideration is regarded as contemplating insufficiency of assets, in money value, to balance liabilities, such money value to be realized, not by a forced and involuntary sale, but by handling in the ordinary way as an ordinarily prudent man would generally conduct his business under the same or similar circumstances."

In substance the same rule was announced in the case of *Hamilton* v. *Menominee Falls Quarry Co.* (1900), 106 Wis. 352, 81 N. W. 876. In effect it may be stated thus: "Insolvency, in such connection, does not mean an insufficiency of quick assets to pay all debts at once, nor ability to meet commercial obligations as they fall due

in the course of business, but that the property of the corporation, real and personal, estimated at a fair and reasonable valuation, is substantially less than its debts."

The above position finds support in the following cases: *Fleming* v. *State* (1911), 62 Texas Crim. 653, 139 S. W. 598; *Appelget* v. *State* (1926), 33 Okla. Crim. 125, 243 Pac. 251; *Brown* v. *State* (1913), 71 Texas Crim. 353, 162 S. W. 339. See discussion in 37 Central Law Journal 174.

Our attention has been called to the case of *Federal Reserve Bank, etc.,* v. *Idaho Grimm Alfalfa Seed Growers' Assn.* (1925), 8 Fed. (2d) 922. This was a civil action in which the limited and restricted meaning was given to the word "insolvent," in accordance with the rule almost if not universally recognized in such cases as has heretofore been pointed out in this opinion

In the case of *State* v. *Hightower* (1924), 187 N. C. 300, 121 S. E. 616, the court said: "To require a bank to close its doors because of inability to pay depositors on demand, and not 'as they become due in the regular course of business' or as a matter of right, would make the fabled position of doubly unfortunate peril most real —the banker while bending all of his energies to avoid the danger of closing, on the one hand, would be quite likely to fall into a still greater danger for himself, on the other, by drifting into the shades of prison walls."

The instruction given by the court in effect told the jury that the Exchange Bank of Spencer was insolvent on the day in question if the actual cash market value of its assets was not sufficient to pay all of its depositors upon demand or to pay all of its liabilities as they became due in the ordinary course of business, as this was the manner and form stated in the first part of the instruction. As pointed out in the case of *State* v. *Hightower, supra,* there are two standards of insolvency advanced by this instruction: (1) The

bank was insolvent if it was unable to pay its depositors on demand; (2) if it could not pay all of its liabilities as they became due in the ordinary course of business. As pointed out above, we think that neither of these tests is correct. In our opinion a bank might be solvent within the meaning of the criminal statute, here involved, and neither be able to pay all of its depositors upon demand, nor be able to pay its liabilities in the ordinary course of business. We think the better rule to be that a bank is solvent if the fair cash value of all the assets of the bank, on the particular day in question, realizable within a reasonable time, by reasonably prudent persons, would be equal to or be in excess of the total liabilities of the bank, exclusive of stock liability; but if the fair cash value of its assets, realizable as above stated and in the manner above stated, is not sufficient to pay within a reasonable time all of its liabilities exclusive of stock liability, such a bank would be insolvent. The question of intent was fully covered by other instructions given, and no question is presented thereon. Instruction No. 8, given by the court of his own motion, was reversible error, and this cause should be, therefore, reversed.

Other questions presented need not be discussed or decided as they may not be presented on the retrial of the case.

Cause reversed, with instructions of the lower court to sustain appellant's motion for a new trial, and for further proceedings not inconsistent with this opinion.