### JOHNSTON *v.* LAFLIN.

1. The title to shares of the capital stock of a national bank passes when the owner delivers his stock certificate to the purchaser, with authority to him or any one whom he may name to transfer them on the books of the bank.

2. In good faith, and without intent to evade his responsibility as a stockholder, A., the owner of such shares, sold them to a broker, to whom he delivered his stock certificate and a power to transfer them, leaving blanks for the names of the attorney and transferee. The broker sold them to B., the president of the bank, who gave his individual check in payment therefor, and received the certificate and power. By the directions of B., a book-keeper of the bank inserted his own name as attorney, and transferred the stock to B. as "trustee" on the official stock register. The entries in the stock ledger and other books of the bank show that B. purchased the stock for it, and reimbursed himself with its funds. The book-keeper had actual knowledge of all the facts. In a suit brought by the receiver of the bank, to compel B. to retransfer the shares, and A. to repay the price therefor, and to have the latter declared a stockholder in regard to them, — *Held*, that as the book-keeper was the agent of the bank, his knowledge of the transaction could not be imputed to A., and that the suit could not be maintained.

APPEAL from the Circuit Court of the United States for the Eastern District of Missouri.

The facts are stated in the opinion of the court.

*Mr. John B. Henderson* and *Mr. George H. Shields* for the appellant.

*Mr. A. W. Slayback, contra.*

MR. JUSTICE FIELD delivered the opinion of the court.

The questions raised in this case are important to owners of shares in the national banks, but they are not difficult of solution. The delay in their decision has been caused by the great pressure of business upon the court, and not from any doubt as to their proper disposition. The appellant, the complainant below, is the receiver of the National Bank of the State of Missouri, appointed by the comptroller of the currency on the 27th of June, 1877. The bank failed on the 20th of that month. The defendant, James H. Britton, was its president, and had been so for some years. On the 16th of May, 1877, and for some time previously, the defendant Laflin was a stockholder

of the bank, owning eighty-five shares of full-paid stock. He was not a director of the bank, nor had he any personal knowledge of its actual financial condition. It is to be presumed that he regarded that condition as sound, for up to the time of the failure he continued to deposit funds with it for a company of which he was a resident director at St. Louis. On the day mentioned, May 16, 1877, he sold his eighty-five shares to a broker, to whom he delivered his certificate of the stock, with a blank power of attorney indorsed thereon, authorizing the attorney, whose name might be subsequently inserted by the broker, or any other party becoming the owner of the certificate, to transfer it on the books of the bank in such form and manner as might be necessary or required by its regulations. Laflin did not at the time know for whom the stock was bought; information on the subject was withheld from him. He received for the price agreed the broker's check on a banking-house in St. Louis, which was paid the same day on presentation. The broker was, however, in fact acting for Britton, the president of the bank, who represented that he was purchasing for himself or for a party whose name he did not disclose. There was no intimation that he was making the purchase for the bank or in its interest. He gave the broker his individual check on the bank for the price of the stock, which was paid on presentation. Subsequently, but on the same day, he received the certificate, and thereupon directed a book-keeper in the bank, named Geralt, to fill up the power of attorney with his, the book-keeper's, name, and to transfer the certificate to his, Britton's, name, as trustee on the transfer book or stock register of the bank, which was accordingly done. He had at the time, to his individual credit at the bank, several hundred dollars more than sufficient to meet his check. He had for years dealt largely on his own account in its stock, and there was nothing in the transaction between the broker and himself to awaken suspicion as to its legality or propriety. Some days afterwards, on the 29th of the same month, at an election of directors, he represented and voted on the stock purchased.

It appears, however, that whilst the shares stood on the official stock register in the name of Britton as trustee, without

stating for whom he was trustee, the transaction was entered on the stock ledger in an account with him as "trustee of the bank." And by his directions the book-keeper credited his individual account with the amount of the check given for the shares, and charged the same amount to the "sundry stock account." In other words, the entries on the books – –other than the official stock register— showed that the stock was purchased by Britton for the benefit of the bank and paid for with its funds. But neither Laflin nor the broker had any notice of the manner in which the transfer was made, or of the entries on the books of the bank, or that the purchase had been made with its funds. The book-keeper, Geralt, who made the transfer and the entries, had, however, actual knowledge of the facts.

The present suit is brought by the receiver of the bank to set aside the purchase of the eighty-five shares, to compel Laflin to repay the money received and Britton to retransfer to him the shares on the books of the bank, and to have him declared to be still a stockholder in respect of those shares.

The statute declares that the capital stock of every national banking association shall be divided into shares of one hundred dollars each, and be transferable on its books in such manner as may be prescribed by its by-laws or articles, and that every person becoming a stockholder, by such transfer, shall, in proportion to his shares, succeed to all the rights and liabilities of the prior holder. There was no by-law of the association here regulating transfers of its shares, but each certificate of stock contained this provision : "Transferable only on the books of the said bank, in person or by attorney, on the return of this certificate, and in conformity with the provisions of the laws of Congress and the by-laws which may be in force at the time of such transfer."

The statute also declares that no association shall be the purchaser of any shares of its own capital stock, unless the purchase be necessary to prevent a loss upon a debt previously contracted. The purchase by the bank, through its president, in the present case was not made to prevent such a loss. Laflin was not indebted to the bank at the time he sold his

shares. The receiver, therefore, starting with the conceded fact that the purchase by the bank was prohibited, and therefore illegal on its part, seeks to charge Laflin with the consequences of such illegality, as though he had dealt directly with the bank, or had known at the time that the purchase was made for it. He assumes such knowledge by Laflin because the party with whose name the blank power of attorney was filled, to make the transfer of the certificate of stock, was cognizant of the facts. His argument is substantially this: The transfer of the stock is not complete until made on the books of the bank, and the attorney who made it knew that the purchase was by the bank and with its funds, and his knowledge was the knowledge of Laflin.

The general doctrine that the principal in a transaction is chargeable with notice of matters affecting its validity, coming to the knowledge of his agent pending the proceeding, is not questioned. Had Geralt, the book-keeper, been appointed by Laflin to make the sale, and had he in negotiating it learned the facts as to the purchase and use of the funds of the bank, there would be ground to invoke the application of the doctrine. But such was not the position of Geralt to Laflin. The sale was consummated, so far as Laflin was concerned, when he delivered the certificate, with the power to transfer it, to the broker. The latter did not mention the name of the principal for whom he was acting. He declined to give it. Laflin had a right, therefore, to treat him as the principal, and if he was competent to make the purchase the sale was valid. Shares in the capital stock of associations, under the national banking law, are salable and transferable at the will of the owner. They are, in that respect, like other personal property. The statute recognizes this transferability, although it authorizes every association to prescribe the manner of their transfer. Its power in that respect, however, can only go to the extent of prescribing conditions essential to the protection of the association against fraudulent transfers, or such as may be designed to evade the just responsibility of the stockholder. It is to be exercised reasonably. Under the pretence of prescribing the manner of the transfer, the association cannot clog the transfer with useless restrictions, or make it dependent

upon the consent of the directors or other stockholders. It is not necessary, however, to consider what restrictions would be within its power, for it had imposed none. As between Laflin and the broker, the transaction was consummated when the certificate was delivered to the latter, with the blank power of attorney indorsed, and the money was received from him. As between them, the title to the shares then passed; whether that be deemed a legal or equitable one matters not; the right to the shares then vested in the purchaser. The entry of the transaction on the books of the bank, where stock is sold, is required, not for the translation of the title, but for the protection of the parties and others dealing with the bank, and to enable it to know who are its stockholders, entitled to vote at their meetings and receive dividends when declared. It is necessary to protect the seller against subsequent liability as a stockholder, and perhaps also to protect the purchaser against proceedings of the seller's creditors. Purchasers and creditors, in the absence of other knowledge, are only bound to look to the books of registry of the bank. But as between the parties to a sale, it is enough that the certificate is delivered with authority to the purchaser, or any one he may name, to transfer it on the books of the company, and the price is paid. If a subsequent transfer of the certificate be refused by the bank, it can be compelled at the instance of either of them. *Bank* v. *Lanier*, 11 Wall. 369; *Webster* v. *Upton*, 91 U. S. 65; *Bank of Utica* v. *Smalley*, 2 Cow. (N. Y.) 770; *Gilbert* v. *Manchester Iron Co.*, 11 Wend. (N. Y.) 627; *Commercial Bank of Buffalo* v. *Kortright*, 22 id. 348; *Sargeant* v. *Franklin Insurance Co.*, 8 Pick. (Mass.) 90.

The transferability of shares in the national banks is not governed by different rules from those which are ordinarily applied to the transfer of shares in other corporate bodies. The power of attorney indorsed on the certificate is usually written or printed, with a space in blank for the name of the attorney to be inserted, for the accommodation of the purchaser. The subsequent filling up of the blank by him with another name, instead of his own, as it may suit his convenience, does not so connect the vendor with the party named as to charge him with the latter's knowledge and thus affect

the previous transaction. A different doctrine would put a speedy end to the signing of powers of attorney in blank. And. instruments of that kind are of great convenience in the sale of shares of incorporated companies, and are in constant use. The name with which the blank may be subsequently filled up by the purchaser is not, in practice, regarded as affecting the previous sale in any respect, but as a matter which concerns only the purchaser. It would be a source of disturbance in business if any other result were attached by the law to the proceeding.

The further position of the receiver, that the assets of the bank constituted a trust fund for the benefit of its creditors, and, where wrongfully diverted, can be followed in whosesoever hands they can be traced, may, as the statement of a general doctrine, be admitted. But it has no application to the case at bar. Here no assets of the bank were received by Laflin. What he received came from the broker, the only person with whom he dealt or whom he knew as principal in the negotiation. The circumstance that the purchase was actually in the interest of the bank — though of that fact the broker was ignorant — cannot affect the latter's character as principal, so far as Laflin was concerned, which he bore in the negotiation.

The whole transaction, on the part of Laflin, was free from any imputation of fraud. He sold his shares to a person competent to purchase and hold them, and received the stipulated price. It would be a perversion of justice and of the ordinary rules governing men in commercial transactions to hold the sale, under such circumstances, vitiated by the relations of the purchaser to others, of which the seller had no knowledge, or any grounds to entertain a suspicion. The validity of the sale of stock cannot be made to depend upon the accident of the immediate purchaser, or of the party to whom he may transfer the certificate, in filling up the blank in the power of attorney with the name of a person, to make the formal transfer, who is acquainted with the secret interests of others in the shares purchased. The validity of a sale and its completeness must be determined by the relation which the contracting parties at the time openly bear to each other.

Of course the whole case here would be changed if the sale by Laflin had not been made in good faith, but was made merely to evade his just responsibility as a stockholder, or to work a fraud upon other stockholders or creditors of the bank.

*Decree affirmed.*