EUBANK v. BRYAN COUNTY STATE BANK OF CADDO, OKL., et al.†

(Circuit Court of Appeals, Eighth Circuit. August 29, 1914.)

No. 4099.

1. BANKS AND BANKING (§ 42*)—LOANS TO DIRECTOR—LIEN ON STOCK—OK-LAHOMA STATUTES.

The banking laws of Oklahoma (Rev. Laws 1910, § 262) provides that the affairs and business of any banking association organized thereunder "shall be managed or controlled by a board of directors"; by section 270 that it shall be unlawful for "any active managing officer * * * to borrow directly or indirectly money from the bank with which he is connected," and that both the officer receiving and the one making such a loan shall be deemed guilty of larceny; and by section 294 that no transfer of stock shall be valid as against the bank "where the registered holder thereof is in debt to the bank for any matured and unpaid obligation" in effect giving the bank a lien on the stock for such debt. *Held*, that a director of a bank is an "active managing officer" within the meaning of section 270 and cannot be relieved from responsibility as such by any action of the other directors, and consequently that a loan of money made by the bank to him is illegal, and the bank cannot assert a lien on his stock therefor as against a prior bona fide pledgee.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 50, 56–60; Dec. Dig. § 42.*

Lien of banks on stock, see note to Curtice v. Crawford County Bank, 56 C. C. A. 179.]

2. BANKS AND BANKING (§ 40*)—TRANSFERS OF STOCK—VALIDITY.

A good-faith purchaser or pledgee of the stock of a banking corporation to whom the certificates have been duly assigned and delivered is the owner in equity of such stock, though the certificates may not be transferred to him on the books as required by a by-law or rule of the corporation.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 49, 51–54; Dec. Dig. § 40.*]

Appeal from the District Court of the United States for the Eastern District of Oklahoma; Ralph E. Campbell, Judge.

Suit in equity by W. C. Eubank against the Bryan County State Bank of Caddo, Okl., and S. W. Maytubby. Decree for defendants, and complainant appeals. Reversed.

This suit was brought by the appellant W. C. Eubank, a citizen of Texas, against the Bryan County State Bank of Caddo, Okl., a banking corporation organized under the laws of that state, and S. W. Maytubby, as liquidating agent of said bank, as defendants, February 21, 1912, in which the appellant as plaintiff claimed as against the defendants the prior right to 80 shares of the capital stock of the bank of the par value of $100 each. The plaintiff claims such right to the stock as pledgee thereof by one H. M. Dunlap who was a director, and the president of the bank, as security for the payment of two loans of money, one of $4,000, made by plaintiff to Dunlap April 1, 1903, and one of $2,000, made February 1, 1908, and for which Dunlap made to plaintiff his two promissory notes upon said dates respectively, and assigned and delivered to him on February 1, 1908, a certificate for 50 shares of the stock of defendant bank as security for the payment of the first of said notes, and a certificate for 30 shares of such stock as security for the second loan.

The defendant bank claims the prior right to the stock under the banking laws of Oklahoma to secure an alleged indebtedness of Dunlap to the bank. who was its president and a director thereof and became indebted to it, as

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

216 F.—53      † Rehearing denied December 4, 1914.

it claims, when he was the owner of said stock which was never transferred to the plaintiff upon its books.

The case was heard upon an agreed statement of facts, the material portions of which are:

"That the Bryan County State Bank was organized January 27, 1908, under the banking laws of Oklahoma with a capital stock of $40,000 fully paid, and commenced business as such bank February 1, 1908; that H. M. Dunlap was a subscriber to the capital stock of said bank, was named as one of its directors in the articles of its incorporation, was elected its first president by its board of directors, and remained such director and president until the bank went into liquidation in January, 1911.

"April 1, 1903, Dunlap borrowed•from plaintiff $4,000, for which he made to plaintiff his promissory note for that amount due in one year with interest, and to secure the same assigned and transferred to plaintiff 50 shares of the capital stock of the Choctaw National Bank of Caddo, Okl., which said stock then stood in the name of Dunlap, who was also president of said Choctaw National Bank. The principal of this note was renewed from time to time by Dunlap, the last renewal maturing April 1, 1908.

"January 15, 1908, the plaintiff sent to the Choctaw National Bank the stock of that bank which he held as security for said $4,000 note, to be surrendered to Dunlap upon receipt by that bank from Dunlap of a like amount of the capital stock of the defendant bank to be held by plaintiff as security for said $4,000 note, in lieu of the stock of the Choctaw National Bank. This was done at Dunlap's request, to facilitate the liquidation of the Choctaw National Bank, and the organization of the Bryan County State Bank in lieu thereof. The change was made as requested by Dunlap, and on February 1, 1908, the organization of the defendant bank was completed and it began business. On the same day its board of directors met pursuant to the call of the president, H. M. Dunlap (who was present as one of said board), and adopted the following resolutions:

" 'Resolved, that the duties of the president of this bank to be such as are defined in the banking laws of the state of Oklahoma, that he act in an advisory capacity with the other officers of such bank, and that he render every service that occurs to him for the good of such bank, and that he act generally in an advisory capacity with the other officers thereof.

" 'That the duties of the first vice president of this bank be in connection with the cashier, the active management of such bank, and charge of all the details of its management; that he and the cashier together shall ·constitute the discount committee, and shall pass upon all loans made by the bank advising with the president when deemed necessary and subject to the supervision of the board of directors, and to preside at all meetings in the absence or disqualification of the president, and to otherwise, in the absence of the president, perform all the duties devolving either by law or by the by-laws upon the president.  *  *  *

" 'The duties of the cashier shall be to have charge of the cash, and the details of the accounts of the bank subject to the general supervision and direction of the first vice president, as hereinbefore mentioned, and to act upon the discount committee.  *  *  *'

"On this date said board also by its resolution gave Dunlap credit upon the books of the bank for $8,000, and this resolution was re-enacted by the board January 11, 1910.

"On the same day 50 shares of the capital stock of the bank evidenced by certificate No. 33 for 30 shares, and certificate No. 34 for 20 shares were issued in the name of Dunlap and were by him assigned and delivered to the plaintiff on said date in lieu of that of the Choctaw National Bank as security for said note of $4,000.

"February 12, 1908, Dunlap borrowed from the plaintiff the further sum of $2,400, and made to him his promissory note therefor due in one year with interest; and as security for its payment assigned to the plaintiff 30 shares of the capital stock of the defendant bank evidenced by certificate No. 1 for 20 shares, and certificate No. 2 for 10 shares, both issued to Dunlap and by him transferred and delivered to plaintiff on that date as security for said note of $2,400.

"April 1, 1908, the $4,000 note was again renewed by Dunlap to plaintiff and the time of payment thereof extended for one year, plaintiff retaining said 50 shares of the capital stock of the defendant bank as security therefor.

"July 7, 1910, Dunlap wrote to the plaintiff at Sherman, Tex., as follows:

" 'Mr. W. C. Eubank, Sherman, Texas—Dear Sir: For the purpose of facilitating a transaction of mine here, I want you to send in the stock attached to my note to you for $4,000 and transfer it to another party, have him make the proper indorsement and return to you. I should like to know that this will be agreeable to you. I would want the stock to stand just where it is on the note and the certificates sent to the bank for the proper transfer, indorsement and return to you.

" 'Yours truly,                [Signed]    H. M. Dunlap.'

"Pursuant to this request, plaintiff, on July 10, 1910, caused to be sent to the defendant bank through the Merchants' & Planters' National Bank of Sherman, Tex., certificates Nos. 33 and 34 of the stock of the defendant bank in a letter which reads in this way:

" 'The Merchants' and Planters' National Bank.

" 'Sherman, Texas, July 10, 1910.

" 'Bryan County State Bank, Caddo, Okla.—Gentlemen: At the request of Mr. W. C. Eubank, we inclose you certificates 33 and 34 aggregating fifty shares of your stock to be substituted in accordance with the blank instructions attached and which is to be signed by the party to whom these shares are to be transferred. The shares themselves are to be transferred in blank. Return the certificates and instructions to us after they are executed as above directed, and very much oblige.

" 'Very respectfully yours,     [Signed]    F. A. Batsell, Asst. Cashier.'

"On July 11, 1910, Henry W. Wells, who was then cashier of the defendant bank and who was prior thereto its assistant cashier, delivered to plaintiff 30 shares of its capital stock evidenced by certificate No. 77, and 20 shares thereof evidenced by certificate No. 78, which had been issued to said Wells in lieu of certificates Nos. 33 and 34, and by him assigned and delivered to the plaintiff as collateral security for said $4,000 note; Wells writing to the plaintiff a letter which reads as follows:

" 'July 11, 1910.

" 'Mr. W. C. Eubank, Sherman, Texas—Dear Sir: You will please hold the attached fifty shares of stock in the Bryan County State Bank as represented by certificates Nos. 77 and 78 as collateral to and subject to the terms of the $4,000 note dated April 1, 1908, due twelve months after date, to which reference is made for fuller description, given to you by H. M. Dunlap in lieu of certificates Nos. 33 and 34 for a like amount of stock in said bank which you now have and exchange for accommodation of Mr. H. M. Dunlap and myself.

" 'Yours very truly,            [Signed]    Henry W. Wells.'

"Said certificates Nos. 77 and 78 were received and accepted by the plaintiff in lieu of such certificates Nos. 33 and 34 for a like amount of the stock of the defendant bank.

"The stock of the defendant bank so assigned to plaintiff was never transferred to him upon the books of that bank, and the 50 shares thereof evidenced by certificates Nos. 77 and 78, which were issued to Henry W. Wells in lieu of certificates Nos. 33 and 34 at the request of Dunlap, stand upon its books in the name of said Wells, and the 30 shares evidenced by certificates Nos. 1 and 2 stand upon its books in the name of Dunlap its president; all of which certificates are in the usual form of the certificates of the capital stock of said bank; and it is agreed that Wells held said certificates Nos. 77 and 78 as trustee for Dunlap.

"On February 7, 8, and 10, 1908, Dunlap gave to the bank for money borrowed by him from it, his three notes for $2,000, $3,000, and $2,500 respectively, aggregating $7,500, and on May 8, 1908, one note for $500, amounting in all to $8,000. These notes were renewed from time to time and finally paid in full on or before October 20, 1909, except the one of February 7, 1908, for $2,000.

"November 5, 1909, Dunlap made to the bank his promissory note for $3,800, for money borrowed, from the proceeds of which the note of February 7, 1908, for $2,000 was paid.

"December 5, 1909, Dunlap gave to the bank his note for $2,000, and on January 11, 1910, another note for $2,000. These notes with the one of November 5, 1909, for $3,800 aggregating $7,800, were held by the bank and unpaid January 21, 1911, when it ceased doing business and went into liquidation; the defendant S. W. Maytubby being appointed liquidating agent, and who when this suit was commenced was settling its affairs as such liquidating agent.

"The depositors and all other creditors of the defendant bank have been paid in full.

"The assets of the bank after the payment of all its debts and liabilities are insufficient to pay its stockholders in full for the stock held by them.

"That Dunlap at all the dates herein mentioned was justly and truly indebted to the plaintiff in the full amount of said notes, and plaintiff held said shares of stock as security for the payment thereof."

It is alleged in the bill of complaint that on June 6, 1911, the defendant bank recovered judgment and decree in the district court of Bryan county, Okl., against H. M. Dunlap for $19,053.87 and costs, upon various transactions between the bank and said Dunlap in a suit in which the bank asserted, and was adjudged to have, a lien upon said certificates of stock Nos. 1, 2, 77, and 78, for the 80 shares of the capital stock of said bank in controversy herein. This is admitted by the answer. The plaintiff, however, alleges that he was not a party to that suit, knew nothing thereof while it was pending, and is not bound by its decree; and that defendant bank is not entitled to and in fact has no lien upon such stock as against him under the laws of Oklahoma.

Upon the facts as above stated, the District Court dismissed the bill upon the merits at plaintiff's costs, and awarded the stock in controversy to the defendant bank. The plaintiff appeals.

V. B. Hayes, of Durant, Okl., and McReynolds & Hay, of Sherman, Tex., for appellant.

McPherren & Cochran, of Durant, Okl., for appellees.

Before SANBORN and CARLAND, Circuit Judges, and REED, District Judge.

REED, District Judge (after stating the facts as above). [1] That the appellant (plaintiff) is a pledgee in good faith and for value of the 80 shares of the stock of the Bryan County State Bank in controversy, to secure a bona fide debt owing him by Dunlap, is not, and could not, under the foregoing facts, be successfully controverted. That fact will therefore be considered as established. Does the fact that such stock was not transferred to him upon the books of the bank deprive him of the right to participate in the final liquidation of its assets in proportion to the amount of such stock as against the other stockholders, its depositors and all creditors of the bank other than such stockholders (if they can be regarded as creditors) having been paid in full?

The provisions of the banking laws of Oklahoma bearing upon this question are (the sections referred to are those of the Revised Laws of Oklahoma 1910, Annotated):

Section 262: "The affairs and business of any banking association organized under the laws of this state shall be managed or controlled by a board of directors of not less than three nor more than thirteen in number, who shall be selected from the stockholders. * * * Any director, officer or

other person who shall participate in any violation of the laws of this state, relative to banks and banking, shall be liable for all damages which said bank, its stockholders, depositors or creditors shall sustain in consequence of such violation. The board shall select from among their number the president and secretary, and shall select from among their stockholders a cashier. Such officers shall hold their offices for a term of one year and until their successors are elected and qualified. * * * The board of directors shall hold at least two regular meetings each year, and at such meetings a thorough examination of the books, records, funds and securities held by the bank shall be made and recorded in detail upon its record book, and a certified copy thereof shall be forwarded to the bank commissioner and to each stockholder of record within ten days."

Section 264: "The violation of any of the provisions of this chapter by the officers or directors of any bank organized or existing subject to the laws of this state shall be sufficient cause to subject the said bank to be closed and liquidated by the bank commissioner and for the annulment of its charter."

Section 266: "No bank shall employ its moneys, directly or indirectly, in trade or commerce, * * * and shall not invest any of its funds in the stock of any other bank or corporation, nor make any loans or discount on the security of the shares of its own capital stock, nor be the purchaser or holder of such shares, unless such securities or purchase shall be necessary to prevent loss upon a debt previously contracted in good faith; and stock so purchased or acquired shall, within six months from the time of its purchase, be sold or disposed of at public or private sale, and after the expiration of six months any such stock shall not be considered as part of the assets of any bank. * * * "

Section 268: "The total liabilities to any bank of any person, corporation or firm, for money borrowed, including in the liabilities of such company or firm the liabilities of the several stockholders, officers or members thereof, shall not at any time exceed twenty per cent. of the capital stock of such bank. * * * "

Section 270: "It shall be unlawful for any active managing officer of any bank organized or existing under the laws of this state to borrow, directly or indirectly, money from the bank with which he is connected; and the officer making or authorizing a loan to any such person, as well as the person receiving the same, shall be deemed guilty of a larceny of the amount borrowed."

Section 273: "Every bank shall make at least four reports each year, and oftener if called upon by the bank commissioner and according to the form which may be prescribed by him, verified by the oath or affirmation of the president or cashier of such association, and attested by the signatures of at least two of the directors. * * * "

Section 282: "Every banker, officer, employé, director or agent of any bank who shall neglect to perform any duty required by this chapter, * * * shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine not to exceed one thousand dollars, or by imprisonment * * * or by both" (as provided in this section).

Section 290: "The president and cashier of every incorporated bank shall cause to be kept at all times a correct list of the names and residences of all the shareholders in the bank and the number of shares held by each, in the office where its business is transacted. * * * "

Section 294: "The shares of stock of an incorporated bank shall be deemed personal property, and shall be transferred on the books of the bank in such manner as the by-laws therefor may direct, but no transfer of stock shall be valid against a bank or any creditor thereof so long as the registered holder thereof shall be liable as a principal debtor, surety or otherwise to the bank for any debt, nor in such cases shall any dividend, interest or profits be paid on such stock so long as such liabilities continue, but all such dividends, interests or profits shall be retained by the bank and applied to the discharge of such liabilities, and no stock shall be transferred on the books of any bank where the registered holder thereof is in debt to the bank for any matured and unpaid obligations."

Section 295: "It shall be unlawful for any bank to loan its funds to its stockholders on their stock as collateral security; and the total indebtedness of the stockholders of any bank shall at no time exceed fifty per cent. of its paid-up capital: Provided, that any bank may hold its stock to secure a debt previously contracted."

The District Court was of opinion, and so held, that Mr. Dunlap as president of the defendant bank was not an active manager thereof within the meaning of section 270 of the Oklahoma banking law, in view of the resolution of the board of directors of February 1, 1908, respecting his duties as president; and that the loan of the bank to him was not therefore within the prohibition of that statute. If the duties of Dunlap as one of the managers of the bank depended alone upon the fact that he was its president, it may be that the board of directors might prescribe and limit his duties, a question that need not now be determined, for section 262 of the Oklahoma statute imposes upon the directors of the bank, of which Dunlap was one, the positive duty of its management and control. His duties as one of the managers of the bank arose therefore from the fact that he·was one of its directors, and not alone from the fact that he was its president; and these duties we think cannot be restricted or limited by any action of the board of directors. Bank v. Lanier, 11 Wall. 369, 376, 20 L. Ed. 172. Aside from this, the resolution imposes upon Dunlap as president the duty of acting in an advisory capacity with the other officers of the bank, and rendering to them "every service that occurs to him for its good." Obviously this does not limit his duties and obligations to the bank as one of its directors and managers, but rather enlarges, if anything, his duties as president of the bank.

Section 282 of the Oklahoma statute provides that "every banker, officer, employé, director or agent of a bank who shall neglect to perform any duty required by this chapter, * * * shall be deemed guilty of a felony." The duty of a director of the bank to participate in the management and control of its affairs is certainly one imposed by this statute, and the failure to perform that duty is declared by the act to be a felony punishable by fine or imprisonment, or by both.

A careful reading and consideration of the banking law of Oklahoma convinces beyond any doubt that it was its purpose to impose upon the principal officers and directors of banks organized under its provisions the positive duty of its management and control; and not that they should act as mere figureheads or dummies upon whom no responsible duty should rest. That Mr. Dunlap as president and director of this bank was its controlling spirit and was one of its active managers, sufficiently appears from the agreed facts; and that the loans made to him by the bank and for which it now asserts and claims a lien upon the stock thereof pledged to the plaintiff was in violation of the banking act of Oklahoma and unlawful. Notwithstanding this, it is contended in behalf of the bank that it may rightly enforce its debt against Dunlap as a lien upon the stock in controversy standing in his name and in the name of Wells upon its books as the registered holders thereof under section 294, above, of the Revised Laws of

Oklahoma; and National Bank v. Matthews, 98 U. S. 621, 25 L. Ed. 188, and other cases following the rule of that case are cited in support of this contention.

In National Bank v. Matthews, the bank had made a loan in good faith to Price & Co., and as security therefor had taken a mortgage upon certain real estate of Matthews. The debt not being paid at maturity, the bank was about to foreclose the mortgage to enforce the payment of the debt from the real estate covered thereby, when Matthews sought to enjoin such foreclosure upon the ground that the mortgage was void as having been made in violation of the National Bank Act. It was held by the Supreme Court that the loan having been made in good faith the taking of the mortgage as security did not invalidate the debt; that only the government could successfully challenge the validity of the mortgage and that the mortgagor could not do so. The fact that the loan of the bank was made in good faith and was not in violation of law was held an important factor in the determination of the case.

In the present case the loans by the bank to Dunlap were in direct violation of the Oklahoma bank act. Sections 266 and 294 of that act only give at most a lien to the bank upon its stock for a valid debt owing to the bank and contracted in good faith, and not for one contracted in violation of its provisions. National Bank v. Matthews and the cases following it do not, we think, sustain the contention of the bank.

[2] The present case falls within the rule that a good-faith purchaser or pledgee of the stock of a banking corporation to whom the certificates have been duly assigned and delivered is the owner in equity of such stock, though the certificates may not be transferred to him upon its books as required by a by-law or rule of the corporation. Such an entry is not for the purpose of transferring the beneficial ownership of the stock in the absence of a statute so requiring, but is for the protection of parties dealing with the bank and to enable it to know who are its stockholders entitled to vote at its meetings and to receive dividends when declared; in other words, it is intended to prescribe a method of transfer which shall be deemed effectual in all matters relating to the internal government and management of the corporation, rather than to prescribe a method of transfer which is to be observed between a stockholder and third parties. Bank v. Lanier, 11 Wall. 369. 20 L. Ed. 172; Bullard v. Bank, 18 Wall. 589, 21 L. Ed. 923; Johnston v. Laflin, 103 U. S. 800, 26 L. Ed. 532; Masury v. Arkansas Nat. Bank, 93 Fed. 603, 35 C. C. A. 476; Nicollet National Bank v. City Bank. 38 Minn. 85, 35 N. W. 577, 8 Am. St. Rep. 643. And see Ardmore State Bank v. Mason, 30 Okl. 568, 120 Pac. 1080, 39 L. R. A. (N. S.) 292; Farmers' & Merchants' Bank v. Cherokee Trust Co. et al., 32 Okl. 700, 123 Pac. 153—arising under the Oklahoma bank act now under consideration.

In Johnston v. Laflin, 103 U. S. 800, 26 L. Ed. 532, a case involving the sale of capital stock of a national bank, Mr. Justice Field speaking for the court said:

"Shares in the capital stock of associations, under the national banking law, are salable and transferable at the will of the owner. They are, in that respect, like other personal property. The statute recognizes this transferability, although it authorizes every association to prescribe the manner of their transfer. Its power in that respect, however, can only go to the extent of prescribing conditions essential to the protection of the association against fraudulent transfers, or such as may be designed to evade the just responsibility of the stockholder. · It is to be exercised reasonably. Under the pretense of prescribing the manner of the transfer, the association cannot clog the transfer with useless restrictions, or make it dependent upon the consent of the directors or other stockholders. * * * The entry of the transaction on the books of the bank, where stock is sold, is required, not for the translation of the title, but for the protection of the parties and others dealing with the bank, and to enable it to know who are its stockholders, entitled to vote at their meetings and receive dividends when declared. * * * Purchasers and creditors, in the absence of other knowledge, are only bound to look to the books of registry of the bank. But as between the parties to a sale, it is enough that the certificate is delivered with authority to the purchaser, or any one he may name, to transfer it on the books of the company, and the price is paid. If a subsequent transfer of the certificate be refused by the bank, it can be compelled at the instance of either of them. * * *"

In Masury v. Arkansas National Bank, 93 Fed. 603, 35 C. C. A. 476, Judge Thayer, speaking for this court upon this same question, said:

"In a great number of cases it has been held, and such must be regarded as the prevailing rule, that such a provision (that stock in a corporation shall be transferred only on its books), when found either in a special charter or in a general incorporation act, or in the by-laws of a corporation, is intended to prescribe a method of transfer which shall be deemed effectual, as between the corporation and its stockholders, in all matters relating to the internal government and management of the corporation, rather than to prescribe a method of transfer which must be observed as between a stockholder and third parties. Notwithstanding such a provision in the charter of a corporation, a stockholder thereof may divest himself of all beneficial interest in his stock by a written assignment of the same and a delivery of his stock certificate, or by the indorsement and delivery of his stock certificate, or, as some authorities hold (Cook, Stock & S. §§ 308, 375), by the delivery of his stock certificate without indorsement, although no transfer is made on the books of the corporation. A transfer of his stock in either of the two ways first above indicated, although such transfer is not registered on the corporate books, estops the stockholder from claiming any further title to the stock so transferred, as against subsequent bona fide purchasers thereof for value"—citing a number of cases.

See, also, Nicollet National Bank v. City Bank, 38 Minn. 85, 35 N. W. 577.

Section 294 of the Revised Laws of Oklahoma plainly authorizes the sale and transfer by the owner of shares of the capital stock of a bank organized under the Oklahoma bank act. It provides, however, that they shall be transferred upon the books of the bank in such manner as its by-laws may direct; but that no stock shall be transferred on the books of the bank when the registered holder thereof is in debt to the bank for any matured and unpaid obligations (section 266) previously contracted in good faith.

If there is any by-law of the defendant bank prescribing the manner of transferring the shares of its capital stock upon its books the

agreed facts do not show it. Dunlap assigned 50 shares of the stock in controversy to the plaintiff February 1, 1908, the day the organization of the bank was completed, and on February 12, 1908, 30 shares. On these dates Dunlap made to the bank his promissory notes for $7,500; but on February 1st he was given credit upon its books by the board of directors for $8,000; and this resolution was re-enacted by the board of directors January 11, 1910, the date of the last loan made by the bank to Dunlap. What these credits were for does not appear. On May 8, 1908, he made another note to the bank for $500. These notes were all paid to the bank on or before October 20, 1909, except the one of $2,000, dated February 1st, and that was paid November 5, 1909, from the proceeds of the note of $3,800, made that date. All the notes of Dunlap so held by the bank when the stock in controversy was assigned to the plaintiff (if those of February 1st may be said to have been so held by it) were paid on or before November 5, 1909, and the notes now claimed by the bank originated on or after that date, long after the assignment of the stock to plaintiff. On this date, therefore, there was nothing to justify the bank in refusing, if it had then been requested to transfer the stock in question to the plaintiff as pledgee thereof upon its books, conceding, without admitting or holding, that the loans of the bank made to Dunlap were in good faith and not in violation of the Oklahoma bank act.

It seems incredible that Wells, the cashier of the bank, its vice president, and directors other than Dunlap, did not know of the pledge of this stock of Dunlap to the plaintiff long before the last loan was made to Dunlap; but whether or not they actually knew thereof is not important, for their duty required them to know that the loans of the bank to Dunlap as one of its directors were forbidden by the act under which the bank was organized and doing business, and that such loans were unlawful in their inception, and were not therefore in good faith. The bank and its stockholders, whose agents its managers and directors were in making these loans, cannot equitably be awarded this stock as against the plaintiff who is a good-faith holder thereof without notice of any claim or right thereto by them.

It is said that plaintiff must be presumed to know that the Oklahoma bank act gave to the bank a lien on such stock for the debt of Dunlap to it, and took the assignment of the certificates subject to the rights of the bank under such lien. Admitting that plaintiff must be presumed to know the law, he had the right to assume, and to act upon the assumption, that its directors and managers would not deliberately violate that law.

The District Court erred in dismissing the bill and awarding the stock in controversy to the bank for the benefit of its stockholders. Its decree is reversed, and the cause remanded to that court, with directions to grant the prayer of the bill and award the beneficial interest in the stock in controversy to the plaintiff, and it is ordered accordingly.

Reversed.