### J. E. McCONNELL v. STATE.

No. A-8839. Sept. 27, 1935.
Rehearing Denied March 21, 1937. Mandate Issued May 22, 1937.
(71 Pac. 2d 635.)

Dudley, Hyde, Duvall & Dudley, Mounts & Chamberlin, and H. P. Daugherty, for appellant.

Mac Q. Williamson, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DOYLE, J. This appeal is from a judgment of conviction pronounced and entered by the district court of Tillman county, in pursuance of the verdict rendered by a jury finding, "J. E. McConnell guilty as charged of re-

ceiving a deposit in a state bank when said bank was insolvent, and assess his punishment by a fine of $3,500."

The information charged that J. E. McConnell and C. E. McConnell did, on or about the 12th day of January, 1932, commit the crime of knowingly receiving money for deposit, when the bank was insolvent, in manner and form as follows:

"That the said defendants, J. E. McConnell and C. E. McConnell, in the county and state aforesaid, on the day and year aforesaid, being then and there active officers and directors of the Security State Bank of Frederick, Okla., a corporation duly organized and existing under and by virtue of the laws of the state of Oklahoma and then and there engaged in transacting a general banking business in Tillman county, Oklahoma, with its principal place of business at Frederick, Okla., did, as such officers and directors of said bank, knowingly, willfully, unlawfully and feloniously accept and receive a deposit of and from J. Fyie, in said bank in the sum of ($500) five hundred dollars, in good and lawful money of the United States of America, consisting of checks of the value of five hundred dollars ($500), in good and lawful money of the United States of America, the personal money of J. Fyie, when said bank was insolvent, and said defendants and each of them then and there knew said bank was insolvent, contrary to, etc."

This information charges an offense under section 9188, St. 1931 (6 Okla. St. Ann. § 233), which reads:

"No bank shall accept or receive on deposit, with or without interest, any money, bank bills or notes, or United States treasury notes, gold or silver certificates, or currency, or other notes, bills, checks or drafts, when such bank is insolvent; and any officer, director, cashier, manager, member, party or managing party of any bank who shall knowingly violate the provisions of this section, or be accessory to or permit or connive at the receiving

or accepting of any such deposit, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $5,000, or by imprisonment in the penitentiary not exceeding five years, or by both such fine and imprisonment."

As reasons for a reversal several errors are assigned, among them being that the evidence is insufficient to sustain the verdict.

It appears that the Security State Bank of Frederick was organized in 1920; appellant was a director and vice president. In January, 1923, he was elected president, with a salary of $100 a month; that his son C. E. McConnell, codefendant, was elected cashier, and that they were each successively re-elected as such officers and served as such, until said bank was closed by the State Bank Commissioner, in January, 1932.

It is undisputed that on January 12, 1932, the last day said bank was open for business, J. Fyie deposited with said bank cash or its equivalent in the sum of $500.

On January 15, 1932, the State Bank Commissioner, omitting formal recitals, made the following order:

"And thereupon, after considering the recommendation of Elmer E. Wilson, a duly appointed Assistant Bank Commissioner, who has examined the affairs of said bank, and being familiar with the conditions of said bank, I am of the opinion that said bank should be closed and its books, records and assets taken charge of by me as Bank Commissioner of Oklahoma, as provided by law, for the following reasons, to wit: (1) That the actual cash market value of its assets is insufficient to pay its liabilities. (2) That it is unable to meet the demands of its creditors in the usual and customary manner. (3) That it has failed to make good its reserve as required by law."

It appears that Clyde Faught was appointed liquidating agent together with C. E. McConnell, codefendant,

who continued as such agent but for a short time, then resigned.

Clyde Faught testified that he continued to act as liquidating agent of said bank up to the time of the trial of this case; that after he was appointed, he selected two groups of appraisers, to appraise both secured and unsecured assets of said bank at their cash market value as of January 12, 1932. And they made a report as to the fair market value of both the secured notes and the security behind the notes, and the unsecured notes.

The books of the bank were introduced to show the condition at the time of the deposit. Then the bank records were identified and introduced in evidence, consisting of the stock register, the teller's cashbook covering dates of November 30, 1931, to January 14, 1932, the general ledger, the liability ledger, the draft register, the certificate of deposit register, and the cashier's check register, also note case containing notes. The minutes of the meetings of the board of directors of said bank from April 28, 1921, also financial condition of the bank, October 1, 1930, and the minutes of the meeting of the board of directors, including instructions of the Assistant Bank Commissioner, were introduced in evidence. Also what is called the liquidation report, being an inventory of the assets and liabilities of said bank, when closed, was introduced in evidence.

The liquidation report shows that on January 14, 1932, the loans and discounts of said bank on said date were $267,865.98. That the unpledged notes were $187,-175.50, that the pledged bills payable showed $41,360.48, and the pledged rediscounts $39,330.

Mr. Faught further testified that the loss would be approximately $100,000, that the legal reserve was approx-

imately short $24,000, on the 12th day of January. On cross-examination he stated a bank in a town of this size was required to keep 20 per cent. of deposits in cash; that quite frequently banks were below their legal reserve; that over a period of time a bank can be in strong financial condition and still have less than the legal reserve; that the condition of the reserve is not necessarily an indication of the condition of the bank.

James M. Fritz, assistant to the Bank Commissioner, testified that he investigated the books of said bank and checked all deposits received in the year 1931, and up to the closing of the bank in January, 1932, to determine what deposits were received by appellant, as indicated by his initials on deposit tickets; and that appellant had received deposits in the total amount of $144,192.67; that on January 11, the day before the bank was closed, appellant received six deposits aggregating to $400.58; that he did not find a deposit ticket with appellant's initials on it for January 12th; that J. Fyie's deposit was taken on January 12th, but it was not taken by appellant.

A. E. Snodgrass testified that he had about $6,000 on time deposit; that on December 31, 1931, he told appellant he would take his time deposit out and did take it out; that appellant insisted on him putting it back, saying the bank was as sound as a dollar and told him he was behind the bank with every dollar he had, for him not to fear for his money; that he also put in $436.87 that day; that in everyday business with this bank, he dealt chiefly with J. E. McConnell.

S. H. Ellis testified that he had known J. E. McConnell for 25 years; that from the time the bank opened until it closed, he transacted business with this bank; that J. E. McConnell's office was in the front of the bank;

that in a conversation with him, a couple of weeks before it closed, appellant said: "We never have needed any money; we are all right."

J. Fyie testified that he was doing business with the bank before it closed, had on deposit $3,864.62, and made a deposit of $500 on January 12, 1932; that he had been paid 20 per cent. In a conversation with J. E. McConnell just before the bank closed about the bank's condition, he said that Mr. Milam and Charley and he owned the bank, and that Mr. Milam was very wealthy.

State rests. Motion made on the part of the defense to direct the jury to return a verdict of not guilty for the reason that the testimony is insufficient to warrant a conviction, which motion was overruled.

Upon the part of the defense, Harry L. McConnell, son of appellant, testified that he was teller in the bank since 1923; that his brother, C. E. McConnell, had the management of the bank during the time he worked there; that he employed the help and fixed the salaries, and his father had nothing to do with that, but once in a while his father would receive deposits. On cross-examination he said he never attended meetings of the board of directors.

Esther Richardson testified that she worked in the bank from February, 1930, until the bank was closed; that she was employed by C. E. McConnell; that she did not attend meetings of the board of directors; that as far as she knew C. E. McConnell made the loans and looked after the details of the operation of the bank.

A number of witnesses testified that they had for several years transacted business with the bank, but did not transact their business with appellant.

As a witness in his own behalf, J. E. McConnell testified that he has resided in Tillman county about 30 years, became connected with the Security State Bank in 1920, owned 10 shares of stock, and that was all he ever owned; was president since 1923. That he never at any time attempted to actively manage the bank; never passed on any of the loans, or extended any credit; never had anything to do with borrowing money from other banks; left that up to his son Charley. That he always had money on deposit in the bank. That Mr. Milam and Mr. Phillips and his son Charley came to his house that evening; they said they needed some cash and would have to have it for the next morning. That he believed the bank was solvent and told them he would put up everything he had if necessary. Then they decided that it would be best to close the bank; that the Bank Commissioner did not have anything to do with closing the bank. On cross-examination he stated, "I was in the wholesale and retail business about 16 years." Against objection he stated he owned the bank building, and another building on that corner, also owned the Piggly Wiggly store building, and the Basket Grocery building, and owned his home. That he owned 160 acres three miles east and one north of the city; owned another 160 acres; no indebtedness against this property. That his son Charley received $4,500 a year as cashier, his son Harry received $125 a month as teller, and he himself received $100 a month as president. That on April 13, 1931, he had on deposit $5,849.93, on June 16th he had $4,593.24, on August 17th $4,023.68, on September 26, 1931, $2,704.98, and had on deposit $842.58 when the bank closed. That as the owner of the bank building he received $225 per month rent and $100 a month salary, his son C. E. $400 a month, and his son Harry $125 a month. That he was on the board of directors since

1923, and was president during that time. That he never told any man that his personal fortune was behind anything and didn't remember about the telling that two rich men were stockholders, one at Chelsea, Okla., and one at Kansas City, who were at all times ready to put cash up if necessary; that he might have told some men that Mr. Milam and Mr. Hovey, owning stock in the bank, were well fixed; that his son Charley never had any money to amount to anything. That he signed all reports to the Bank Commissioner as to the condition of the bank.

At the close of the evidence a demurrer was interposed on the ground that the evidence introduced by the state fails to prove the allegations in the information, with supplemental motion for an instructed verdict of not guilty on the following grounds: That the evidence is insufficient to prove that the Security State Bank was insolvent on January 12, 1932; that the evidence fails to prove that the defendant had knowledge that said bank was insolvent at that time, if the bank was insolvent; and that the state has failed to prove that the defendant was an active managing officer of said bank when the alleged deposit was made. Demurrer and motion overruled. Exceptions reserved.

Some objections were made and exceptions taken to rulings of the court in the admission of evidence.

Complaint is made that the court erred in admitting Exhibit 1, being the minute book of the proceedings of the board of directors and stockholders of said bank; in admitting Exhibit 37, the same being a financial statement of officers and stockholders of said bank as shown by report on file in the office of the Bank Commissioner, of date November 1, 1930, in answer to his letter, wherein the Bank Commissioner classified $40,000 of the bank's

loans slow, and $96,000 of the bank's assets as doubtful. And Exhibit 38, being a letter from the banking department commenting upon examiner's report upon the condition of the bank of July 14, 1931; which report classifies $95,000 of the bank's paper as doubtful, and classifies $27,000 of the amount as losses, and showing the bank's reserve was only 14 per cent. It will be observed that this examination was six months prior to the bank's closing. Also Exhibit 39, being inventory of the entire assets and liabilities of said bank made by the bank examiner as of January 30, 1932, which exhibit contained the order of the Bank Commissioner of January 15th, closing said bank.

Section 9176, St. 1931 (6 Okla. St. Ann. § 154), provides in part:

"Upon taking possession of the property or the assets of such bank, the commissioner shall make an inventory of the assets in duplicate; one to be filed in the office of the commissioner, one in the office of the court clerk of the county in which the said bank was doing business, and the court clerk of said county shall give such case a number on the district court docket."

Section 337, St. 1931 (12 Okla. St. Ann. § 502), provides in part:

"The books and records required by law to be kept by any county judge, county clerk, county treasurer, register of deeds, clerk of the district court, justice of the peace, police judge or other public officers, may be received in evidence in any court."

Under this provision the official reports and records of the State Bank Commissioner, including reports of the bank examiner, were competent and admissible in evidence, in so far as they pertained to the issues involved, subject

to explanation or impeachment. Bradshaw v. State, 18 Okla. Cr. 619, 197 Pac. 715; Hays v. State, 22 Okla. Cr. 99, 210 Pac. 728.

In the case of Hodges v. State, 38 Okla. Cr. 259, 259 Pac. 1056, 1057, it is said:

"Testimony that the bank had failed to maintain the reserve required by law tended to throw light upon the condition of the bank as being insolvent or otherwise and tended to show the knowledge of defendants of the bank's condition, and for this purpose was admissible. Was the bank actually insolvent at the time the deposit was received, and did defendants have knowledge of such condition? was the issue for the jury. Now, if the bank had failed to maintain its reserve as required by law, this was a circumstance to be taken into consideration along with the other evidence for the purpose of determining whether or not the bank was actually insolvent and whether or not the defendants knew of its condition. State v. Syverson, 39 S. D. 638, 166 N. W. 157."

The liquidation report admitted in evidence was one of the duplicate originals filed in the office of the court clerk of Tillman county, bearing the file mark of said court clerk, under date of January 30, 1932. The order of the Bank Commissioner closing said bank was a part of this public record, properly contained therein, and admissible as a part of said public record.

It follows that the evidence objected to was competent. The solvency of the bank could not be ascertained as a mere matter of addition of its assets and the subtraction of its liabilities. The bank's solvency depended on the value of its assets, and the examination by the State Banking Department was to determine that fact. The assets were admittedly not worth their face value, and the examination by the State Banking Department

following the closing of the bank was to determine what its assets were worth. The liabilities of the bank were admitted. The testimony of the liquidation agent was that he found the value of the assets to be $100,000 less than their face value, as shown by the exhibits properly admitted in evidence. Of course, this testimony and evidence was not conclusive upon the jury and other testimony on this issue was received. The evidence discloses that on the trial date, April 16, 1934, the uncollected notes totaled $168,471.71, listed as realized losses.

It is insisted by learned counsel for appellant that the court erred in overruling the demurrer to the evidence and the motion for a directed verdict of not guilty.

This contention necessitated a careful examination and consideration of the records of the bank, and the evidence showing the assets and their value, the liabilities and their amounts, and what were in fact assets. Our conclusion is there was such an abundance of proof of the bank's insolvency at the time the deposit in question was made as to be conclusive. It also conclusively appears that the bank had been insolvent for at least six months.

Section 9170, St. 1931 (6 Okla. St. Ann. § 145), reads:

"A bank shall be deemed to be insolvent, first, when the actual cash market value of its assets is insufficient to pay its liabilities; second, when it is unable to meet the demands of its creditors in the usual and customary manner; third, when it shall fail to make good its reserve as required by law."

And section 9136, St. 1931 (6 Okla. St. Ann. § 111), defines a reserve required by banks to be kept, and provides that a bank that shall fail for a period of 30 days after notice from the Bank Commissioner to restore its

lawful reserve, may be deemed insolvent and possession of it may be taken by the Bank Commissioner.

In the case of Appelget v. State, 33 Okla. Cr. 125, 243 Pac. 251, 252, it is said:

"Upon a consideration of the entire statute, we are of the opinion that the word 'insolvent,' as used in section 4128 [section 9188, St. 1931], wherein it is made a crime to accept or receive deposits by an insolvent bank, is that state of being insolvent which arises when the cash market value of the assets of the bank are insufficient to pay its liabilities; or where the bank is unable to meet its obligations, liabilities, and debts, and to pay its depositors in the ordinary course of business, when given a reasonable time to procure the money for such purpose by pledging its collateral and credit to meet any temporary inability or emergency, and not the state of being insolvent set out in sections 4124 and 4135 [sections 9136 and 9170, St. 1931]. It certainly was not the legislative intent to make criminal the accepting or receiving of deposits in a bank insolvent in that technical sense in which the word is used in section 4124 [section 9136], where a bank may be deemed insolvent when it shall fail for a period of 30 days after notice to restore its reserve. Nor was it the legislative intent to make criminal the act of the officers of a bank to accept or receive deposits, where, by reason of some unexpected demand or the failure to receive expected remittance, the bank had failed to pay some liability in the usual and customary manner, as defined in the second subdivision of section 4135 [section 9170]. To conclude otherwise would lead to absurd results. For instance, a bank might have assets worth much more than its liabilities, and yet by inadvertence or negligence have failed to make good its reserve or have failed to procure means to meet some unexpected demand in the usual and customary manner."

This rule finds support in the following cases: Smith v. State, 203 Ind. 561, 181 N. E. 519, 81 A. L. R. 1154. And cases in Annotation 81 A. L. R. 1160.

In this respect the court instructed the jury as bearing upon the testimony as to the value of the assets on the date charged, as follows:

"You are instructed that a bank is insolvent at a certain date in the sense used in the information filed herein, if the assets owned by the bank were not of sufficient value to pay its debts and liabilities, or if the bank was financially unable to pay its debts and obligations as the same become due and payable.

"Now this inability to pay its debts, as herein used, does not mean a temporary inability to pay its debts, such as might occur when there is a 'run on the bank', or failure of the bank to have enough available cash in the bank on any particular day to run the bank for that day, or because of any other emergency but it means an inability of the bank to meet the bank's debts and obligations and pay depositors in the ordinary course of business when given such a reasonable time to get the money as is usually and ordinarily required by a bank in conducting its business under the usual and customary way.

"And in this case now on trial, should you find beyond a reasonable doubt that on the date named in the information, at the time the deposit in question was made that the Security State Bank of Frederick, Oklahoma, did not have sufficient money and under ordinary and usual circumstances was unable to get the same by putting up its notes, collateral, credits, or other assets, in a sufficient sum to pay its debts or obligations, and its depositors as the same became due and were presented for payment in the ordinary course of its business it was insolvent in the sense used in the information; and unless you so find, beyond a reasonable doubt, you should find said bank solvent at the time of its closing."

"Excepted to by defendant and exception allowed.

"F. Mathews, Judge."

This instruction was certainly as favorable as appellant could reasonably ask.

The state was required to prove not only the insolvency of the bank on the date stated, but that appellant knew the bank was insolvent. For this purpose evidence was introduced showing the relationship of appellant to the bank and his knowledge of the assets. The fact that he had signed as president the annual and semiannual reports as to the condition of the bank as shown by the exhibits introduced as part of the records of the Bank Commissioner's office, the letters to him from the Bank Commissioner's office showing the findings of the bank examiner as to the bank's condition, and testimony of his conversations with persons transacting business with the bank, as to the bank's financial condition; the fact that for more than nine years preceding the closing of the bank its affairs were conducted by appellant and his two sons, C. E. and Harry; that the meeting of the board of directors was held at appellant's home on the evening the bank closed its doors; and the fact that appellant in the last nine months the bank was open reduced his personal deposit in amount of more than $5,000—all of this was competent to show appellant's relationship to the bank and his knowledge of its financial condition.

Counsel for appellant in their brief cite the case of State v. Sanford, 317 Mo. 865, 297 S. W. 73, 78, with excerpts from the opinion, the first as follows:

"Manifestly, and in common justice, appellant was not chargeable at that time with knowledge of the financial condition of the bank as it appeared in the light of later events and subsequent investigation. His culpability in assenting to the reception of the deposit must be measured by what he knew or reasonably should have known concerning the solvency of the bank when the deposit was accepted."

We add another excerpt from the court's opinion:

"Here the evidence offered by appellant tended to show that he had complete confidence in the ultimate solvency of his bank. Every dollar he had, and even the home he had given to his wife, were sacrificed in an attempt to make good such confidence. Most of appellant's fortune, whether or not it was as large as he thought it was is immaterial, was tied up with the fortunes of the bank before it was turned over to the commissioner of finance. That constituted the strongest sort of evidence of his belief in the solvency of his bank. Whether he was justified in his belief or not is beside the question. The test fixed by the statute is knowledge of insolvency or knowledge that his bank is in failing circumstances at the time he assented to the reception of the deposit. The jury had the right and duty to pass upon the question of knowledge from appellant's point of view, as well as from other facts shown in evidence. Concededly appellant was chargeable with actual knowledge of all facts and circumstances bearing on the solvency of his bank which actually existed at the time and which he reasonably should have known. He was chargeable with such knowledge of the assets of the debtors of his bank as he reasonably should have known by use of the means of knowledge then possessed by him."

We think that it is apparent from the record that appellant, as an officer of the bank, was fully acquainted with the condition of the bank and knew at that time, and had known for some time, that the bank was insolvent. We think the evidence is ample not only to show the actual insolvency of the bank, but also the knowledge of appellant with reference thereto.

It is also insisted that the evidence is insufficient to show that appellant was an active managing officer of the bank.

In support of this contention the case of Witte v. State, 35 Okla. Cr. 204, 249 Pac. 968, 970, is relied on. In

this case Judge Edwards in the opinion affirming the judgment says:

"The record shows that defendant was a director of the bank at the time the note in question was taken into the assets of the bank, and that while his resignation had been filed and accepted, it was in fact in abeyance, and he continued in the bank, assisting actively in conducting its operations until October 27. In the case of Eubank v. Bryan County State Bank, 216 F. 833, 133 C. C. A. 37, wherein section 4127, Comp. Stat. 1921 (section 270, Rev. Laws 1910), was under consideration in syllabus 1 it was held:

" '* * * Held, that a director of a bank is an "active managing officer" within the meaning of section 270, and cannot be relieved from responsibility as such by any action of the other directors, and consequently that a loan of money made by the bank to him is illegal. * * *'

"On page 838 [of 216 F.] of said opinion (133 C. C. A. 42), we find the following language:

" '* * * If the duties of Dunlap as one of the managers of the bank depended alone upon the fact that he was its president, it may be that the board of directors might prescribe and limit his duties, a question that need not now be determined, for section 262 of the Oklahoma statute (Rev. Laws 1910) imposes upon the directors of the bank, of which Dunlap was one, the positive duty of its management and control. His duties as one of the managers of the bank arose therefore from the fact that he was one of its directors, and not alone from the fact that he was its president; and these duties we think cannot be restricted or limited by any action of the board of directors.'

"The Supreme Court of the state, in a case growing out of the same transaction, cited in Eubank v. Bryan County State Bank, supra, in the case of Bryan County State Bank et al. v. American National Bank, etc., 56 Okla. 529, 156 Pac. 352, said:

" '* * * It is clear that one of the main purposes of the banking laws of the state of Oklahoma is to impose upon the officers of the bank, such as the president or director, the positive duty of its management and control and to fix upon these officers the duty and responsibility of conducting said bank in accordance with law, and this court should be slow to adopt any construction of law which would relieve these officers from their responsibility. * * *' "

In the case of Appelget v. State, supra, this court held:

"Where the managing officers of a bank, with knowledge that it is insolvent, permit the bank to continue to receive deposits by its employees, they are guilty of accepting and receiving deposits within the meaning of the law, although they do not personally receive the deposits."

And see Hudson v. State, 37 Okla. Cr. 290, 258 Pac. 352.

The evidence shows, on page 48 of minute book, a resolution of the board of directors at the regular semiannual meeting, held July 3, 1926, with the following directors present: J. E. McConnell, C. E. McConnell, Andrew H. Smith and A. L. Schrimsher:

"Motion duly carried that, whereas, it is highly desirable that the officers of this bank should, from time to time, be able to borrow sums of money on its behalf; now therefore, Resolved:

" '1st. That the President, Vice-President and Cashier of this bank are, and each or either of them is, hereby authorized to borrow, from time to time, on behalf of this Bank from the First National Bank in Oklahoma City, Okla., such sums of money, for such times and upon such terms as may to them or to either of them seem advisable, and to execute obligations in the name of the bank for the payment of any sums so borrowed.

" '2nd. That each or either of the said officers is hereby authorized to rediscount with the First National Bank in Oklahoma City, any of the bills receivable now or hereafter held by this Bank, upon such terms and at such time or times as to him or them may seem advisable.

" '3rd. That each or either of the said officers is hereby authorized to pledge any of the bonds, stocks, bills receivable or other securities or property of the bank, for the purpose of securing any moneys so borrowed, and or any such bills receivable so rediscounted, upon such terms as may to the officer pledging the same seem advisable.

" '4th. That the foregoing powers shall continue and remain in force until express notice of their revocation has been duly given to said First National Bank, in Oklahoma City, Oklahoma.'

"Signed C. E. McConnell, secretary; J. E. McConnell, president."

On page 73 of the minute book, the record is as follows:

"Page 73: The annual stockholders meeting of the Security State Bank of Frederick, Oklahoma, was held Tuesday, January 8, 1929.

"The meeting was called to order by J. E. McConnell with the following stockholders present: C. E. McConnell 243 shares, J. B. Milam, 75½ shares, J. E. McConnell 10 shares; A. L. Schrimsher 5 shares, Geo. S. Hovey, 33 shares, represented by proxy in the hands of C. E. McConnell.

"The minutes of the last stockholders meeting were read and approved without any corrections or objections. The cashier presented a statement of the affairs of the bank, and a motion by Mr. J. B. Milam, seconded by Mr. A. L. Schrimsher that a vote of thanks be extended the managing officers, regarding the affairs of the bank."

Thus it appears that appellant was more than a mere director of the bank; he was its president, and he received

an annual salary of $1,200, as one of the managing officers of the bank. The foregoing resolution authorized the president and cashier, or either of them, to borrow money from time to time for the bank, as they or he deemed advisable. The stockholders recognized that there was more than one managing officer of the bank as expressed in the vote of thanks extended to the managing officers.

It appears the capital stock of the bank was $50,000, shares 500, and that appellant and his son C. E., codefendant, were the owners of a majority of the stock, and together had control of the affairs of the bank.

Upon this record the jury were fully warranted in concluding that appellant was a managing officer of the bank.

It is sufficient to say that when a bank becomes insolvent, it should decline to receive deposits and should discontinue business.

What we have said leads to the conclusion that the court did not err in overruling the demurrer to the evidence and in refusing to direct a verdict of acquittal. The weight of the evidence and its convincing effect was for the jury, and not for the court.

Upon a careful examination of the voluminous record, and having considered the assignments of error, argued orally and in the brief, we are satisfied that no exception taken upon the trial is of any force or merit. Our conclusion is that appellant had a trial that was eminently fair and no error requiring a reversal is shown.

The judgment appealed from is therefore affirmed.

DAVENPORT, P. J., and EDWARDS, J., concur.